69 F.3d 549
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES OF AMERICA, Plaintiff-Appellant,
v.
Maria Ann RICHARDSON, Defendant-Appellee.
 No. 95-4039.
 United States Court of Appeals, Tenth Circuit.
 Oct. 13, 1995.
 
 Before ANDERSON, MCKAY and BRORBY, Circuit Judges.
 
 ORDER AND JUDGMENT[1]
 
 1
 The United States filed this interlocutory appeal to challenge the district court's order granting the defendant's motion to suppress. The district court, relying on the magistrate judge's report and recommendation, concluded that while the evidence seized from the defendant's vehicle was based on her voluntary consent, it was nonetheless inadmissible because her consent was tainted by the illegal detention preceding it. Based on a proper certification by the United States Attorney, we have jurisdiction under 18 U.S.C. 3731, and we reverse.
 
 BACKGROUND
 
 2
 Maria Ann Richardson was charged by criminal complaint, and later indicted, on one count of possession with intent to distribute 100 grams of methamphetamine, in violation of 21 U.S.C. 841(a)(1) and 841(b)(1)(B). The events resulting in this indictment stemmed from a traffic stop, by Trooper Fred Swain of the Utah State Highway Patrol, of a car driven by Ms. Richardson. The traffic stop culminated in the seizure of the methamphetamine in question.
 
 
 3
 Ms. Richardson's counsel subsequently filed a motion to suppress the evidence seized by Trooper Swain, claiming it was the result of an unconstitutional search of the vehicle. The motion to suppress was referred to a magistrate judge for the preparation of a report and recommendation under 28 U.S.C. 636(b)(1)(B). After receiving the testimony of Trooper Swain and Ms. Richardson, the magistrate judge recommended the motion to suppress be granted. The magistrate judge concluded the facts and circumstances known to Trooper Swain did not support a finding of reasonable, articulable suspicion to support the additional detention of Ms. Richardson beyond what was necessary to issue her a citation for speeding. The magistrate judge further found Ms. Richardson's subsequent consent to search the vehicle was tainted by this illegal detention, and therefore, the evidence seized was inadmissible under the "fruit of the poisonous tree" doctrine. The United States filed timely objections to the recommendation, and the district court heard oral argument on the objections. Shortly thereafter, the district court issued a written order overruling the United States' objections and adopting the report and recommendation in its entirety. This appeal ensued.
 
 
 4
 "When reviewing an order granting a motion to suppress, we accept the trial court's factual findings unless clearly erroneous, and we view the evidence in the light most favorable to the district court's finding."[2] United States v. Little, 18 F.3d 1499, 1503 (10th Cir.1994) (en banc) (citations and internal quotations omitted). So viewed, the facts adduced at the suppression hearing were as follows.
 
 
 5
 On July 13, 1994, Ms. Richardson was driving a tan or brown colored Lincoln automobile northbound on Interstate 15, a few miles south of Nephi, Utah. Shortly after 5:00 p.m., Trooper Swain's radar detector monitored her vehicle at 81 miles per hour, in excess of the posted 65 mile an hour speed limit. Upon seeing the flashing lights of the police vehicle, Ms. Richardson immediately pulled off the highway onto the shoulder. Trooper Swain exited his vehicle and approached the driver's side of Ms. Richardson's car, at which time he observed it had Wyoming license plates. As he approached her car, he observed the driver was the sole occupant of the vehicle, and he proceeded to ask her for her license and registration. He advised her she had been stopped for speeding and that he was going to issue her a citation.
 
 
 6
 While Ms. Richardson immediately handed over a California driver's license in her name, she could not find the registration after looking through the glove box and around the interior of the car. Because Ms. Richardson had a California license and was driving a vehicle with Wyoming plates, Trooper Swain asked her who owned the car. Ms. Richardson responded it belonged to Kathy Dyer, a friend of hers who lived in Casper, Wyoming. She explained she flew from San Diego, California, to Casper to pick up Ms. Dyer's car so she could drive Ms. Dyer's two year old daughter from Casper to California to stay with Ms. Dyer's sister (the child's aunt). She also stated she was now driving the car back to Ms. Dyer's home in Casper, and was planning to fly from Casper back to California.
 
 
 7
 After this conversation, Trooper Swain returned to his vehicle and called in to his dispatcher with the license plate number, requesting a registration check in order to verify if the car in fact belonged to Kathy Dyer. He also asked the dispatcher to run a "Triple I" check, which reveals whether an individual has a prior arrest record in most of the states in the country. He conceded that while he suspected the vehicle might be stolen, he did not ask the dispatcher to run a stolen car check at that time. It was not until he returned to the Sheriff's office later that evening that he ran a stolen car check.
 
 
 8
 Dispatch responded that Ms. Richardson's license was valid, and that there was a positive match on the Triple I record for a woman named "Marie Ann Erickson." Dispatch believed the name Maria Ann Richardson was an alias for Marie Ann Erickson because they both had the same birthdate. A physical description of Ms. Erickson provided by dispatch appeared to match Trooper Swain's observations of Ms. Richardson, with the exception of the individual's weight. Dispatch also gave the officer Ms. Erickson's social security number and advised she had a tattoo on her left shoulder. Trooper Swain then called for backup. At this point, approximately ten to fifteen minutes had passed and he had completed about half of the citation.
 
 
 9
 Because Trooper Swain knew it would take a few minutes for dispatch to determine exactly what the Triple I record was, he exited his vehicle and asked Ms. Richardson for her social security number. The number she provided matched the number Trooper Swain had been given from dispatch. While he tried to check for the tattoo, he was unable to verify whether she had one on her shoulder. Before Trooper Swain returned to his car, Ms. Richardson provided him with the registration for the car. The registration confirmed a 1986 Lincoln was in fact registered to a Kathy Dyer in Casper, Wyoming, and the license plate on the vehicle matched the one on the registration. Trooper Swain took the registration with him back to his vehicle, at which time dispatch advised him of the nature of the Triple I match. Ms. Erickson had been arrested for battery of a police officer, in addition to several drug-related arrests between 1987 and 1990.
 
 
 10
 The prior arrest record and the different surnames raised some suspicions in Trooper Swain's mind, and he decided he wanted to obtain more information from her. He exited his vehicle, approached Ms. Richardson's vehicle for a third time and asked her to step out of her car, which she did. No one else was present at the time, and Trooper Swain's gun was not drawn. At this point, he asked her what her maiden name was, based on his assumption that the surname Erickson was her maiden name. She responded that her maiden name was "Painter." He then asked her if she ever went by the name Erickson, and this appeared to make her visibly upset. She stated "Erickson" was the name of an ex-husband who she really did not want to think or talk about. She then explained she had subsequently been married to another man named Richardson, and even though they had been separated for eight years, she continued to use his surname because they had never actually been divorced.
 
 
 11
 He then confronted her with her criminal history, and she candidly admitted what her record revealed. She also acknowledged that each of her drug-related arrests involved methamphetamine. At this juncture, Trooper Swain asked for permission to search her car, and Ms. Richardson allegedly[3] responded by saying "you may." During his search, Trooper Swain found a razor blade, a small plastic wrapper with a substance that looked like methamphetamine, a Motorola pager, several video tapes and toiletry items, a pill bottle, two baggies, one containing a white powder substance and one containing a yellow powder substance, a magnifying device, a digital gram scale, two duct taped packages, a spoon and a syringe, and a black purse with a small amount of marijuana. At no point during the search did Ms. Richardson ever ask him to stop searching the vehicle. He then placed her under arrest, which eventually resulted in her being indicted for possession with intent to distribute methamphetamine.
 
 
 12
 On cross-examination, Trooper Swain admitted the information Ms. Richardson gave him regarding the registration and the name of the owner of the vehicle did eventually check out as Ms. Richardson had said. He also admitted he did not run a stolen car check at the time the stop was made to issue her a citation and that when he went back to her car the third time, he was still in possession of her license and registration. In addition, she was not, at that time, free to leave the scene.
 
 
 13
 Ms. Richardson was the only other witness to testify, and the only material discrepancy between her testimony and that of Trooper Swain was she denied giving her consent to him to search the vehicle.
 
 DISCUSSION[4]
 I.
 
 14
 The Supreme Court's recent Fourth Amendment jurisprudence makes it patently clear the touchstone for judging the constitutionality vel non of a search or seizure is, according to the text of that amendment, "reasonableness." See Wilson v. Arkansas, --- U.S. ---, ---, 115 S.Ct. 1914, 1916 (1995) ("[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable.' ") (quoting New Jersey v. T.L.O., 469 U.S. 325, 337 (1985)). We review de novo "the ultimate determination of reasonableness under the Fourth Amendment." United States v. Fernandez, 18 F.3d 874, 876 (10th Cir.1994).
 
 
 15
 In determining whether a seizure comports with the strictures of the Fourth Amendment, we have found it useful to identify three categories of police-citizen encounters: "(1) consensual encounters which do not implicate the Fourth Amendment ... (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity ... and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause." United States v. Bloom, 975 F.2d 1447, 1450-51 (10th Cir.1992); United States v. Santillanes, 848 F.2d 1103, 1106 (10th Cir.1988). Judicial review of police-citizen encounters should proceed in a step-by-step fashion, focusing on each stage of the encounter. For example, what may begin as a routine traffic stop will often escalate into a full-blown arrest or result in a consensual encounter, and therefore, we must insure that the requisite level of suspicion or cause is present at each stage of the encounter.
 
 
 16
 In this case, we are dealing with a traffic stop, a paradigmatic example of a limited investigatory seizure. See United States v. Eylicio-Montoya, 18 F.3d 845, 848 (10th Cir.1994) ("stopping an automobile and detaining its occupants constitute[s] a "seizure" within the meaning of [the Fourth] Amendment' ") (citation omitted); see also United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir.) ("A traffic stop is an investigative detention"), cert. denied, 114 S.Ct. 1862 (1994). "A seizure by means of an investigative detention is constitutional only if supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." United States v. Lambert, 46 F.3d 1064, 1069 (10th Cir.1995) (citations and internal quotations omitted). More specifically, the reasonableness of a traffic stop is evaluated by asking " whether the officer's action was justified at its inception, and whether [the action] was reasonably related in scope to the circumstances which justified the interference." United States v. McSwain, 29 F.3d 558, 561 (10th Cir.1994) (quoting United States v. Dewitt, 946 F.2d 1497, 1501 (10th Cir.1991), cert. denied, 502 U.S. 1118 (1992)).
 
 
 17
 Ms. Richardson concedes Trooper Swain's actions were justified at their inception because she was speeding. Therefore, the issue reduces to whether Ms. Richardson's detention in the period following the initial detention was a reasonable extension beyond what was necessary to justify the stop at its inception (i.e., the issuance of a citation for speeding). See Fernandez, 18 F.3d at 878 ("Fernandez does not argue that [the officer] lacked reasonable suspicion to make the initial traffic stop, but that he was unlawfully detained beyond the time necessary to issue the initial traffic citation.").
 
 
 18
 To answer this question, we begin by reiterating the parameters of what an officer may lawfully do during the course of an otherwise permissible traffic stop.
 
 
 19
 "An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.' "
 
 
 20
 Gonzales-Lerma, 14 F.3d at 1483 (quoting United States v. Guzman, 864 F.2d 1512, 1519 (10th Cir.1988)). Beyond this, detention of an individual is impermissible unless the officer either "has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring.... [Or] the initial detention has become a consensual encounter." Gonzales-Lerma, 14 F.3d at 1483 (citations omitted). We examine separately each of these two exceptions to the rule that the officer must let the individual proceed upon proof of a valid license and registration.
 
 
 21
 In analyzing whether an officer possessed reasonable, articulable suspicion, we note the Fourth Amendment requires only a "minimal level of objective justification." INS v. Delgado, 466 U.S. 210, 217 (1984) (emphasis added). Courts are to view the officer's conduct through a filter of "common sense and ordinary human experience," United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir.1994) (quotations omitted), and in light of "the totality of the circumstances." Fernandez, 18 F.3d at 878 (citations omitted). This approach "does not deal with hard certainties, but with probabilities," United States v. Cortez, 449 U.S. 411, 418 (1981), and is intended to "avoid unrealistic second-guessing of police officers' decisions," Melendez-Garcia, 28 F.3d at 1052 (quotations omitted) giving deference to "the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." United States v. Martinez-Cigarroa, 44 F.3d 908, 912 (10th Cir.) (Baldock, J., concurring) (collecting cases), cert. denied 115 S.Ct. 1386 (1995); see also United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir.1994) ("[T]he Supreme Court has expressly acknowledged law enforcement officers' prerogative to perceive and articulate meaning in actions that, to the untrained eye, appear innocuous") (citation omitted). It should, of course, be obvious that the standard requires the officer actually to "articulate" the "reasonable suspicions" they relied upon; clearly, "[a]n officer's inchoate and unparticularized suspicion or hunch is insufficient to give rise to reasonable suspicion." Fernandez, 18 F.3d at 878 (citation and internal quotations omitted).
 
 
 22
 In determining if the subsequent detention of an individual has evolved into a consensual encounter, we follow the "clear line historically drawn between police-citizen encounters which occur before and after an officer returns a person's driver's license, car registration, or other documentation." United States v. McKneely, 6 F.3d 1447, 1451 (10th Cir.1993). The import of this "clear line" rule is if the officer is still in possession of any of the individual's documentation, then the encounter cannot, either legally or practically, be deemed "consensual." See Lambert, 46 F.3d at 1068 (citing Tenth Circuit cases).
 
 
 23
 In this case, Ms. Richardson testified Trooper Swain had not returned either her license or the registration prior to his additional questioning regarding her surnames and her arrest record, and prior to his request for consent to search the car. Therefore, her subsequent detention beyond the initial traffic stop cannot be justified as a consensual encounter under McKneely.[5] Therefore, this additional detention violated the Fourth Amendment unless the United States can establish[6] that this intrusion was supported by reasonable, articulable suspicion that Ms. Richardson was engaged in criminal behavior. See id.; see also Fernandez, 18 F.3d at 878. We now turn to an analysis of that issue.
 
 II.
 
 24
 The United States contends reasonable suspicion to support the additional questioning and detention of Ms. Richardson may be found in four facts: (1) Trooper Swain's knowledge of Ms. Richardson's prior arrest record, (2) the fact she did not own the car she was driving, (3) her other surnames, and (4) her description of her travel itinerary. While we analyze each of these proffered justifications individually, we do so only for clarity; "[o]ur task ... is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious. Rather, the reasonable suspicion calculus turns on whether the specific articulable facts, when viewed through the lens of a reasonable law enforcement officer, justified [the detention]." Lopez-Martinez, 25 F.3d at 1484 (collecting cases); see also Martinez-Cigarroa, 44 F.3d at 912 (Baldock, J., concurring) ("we consider whether the individual facts in aggregate yield reasonable suspicion") (emphasis added).
 
 
 25
 The first fact relied on by Trooper Swain was Ms.
 
 
 26
 Richardson's prior arrest record, which included multiple
 
 
 27
 drug-related arrests between 1987 and 1990. The magistrate
 
 
 28
 judge heeded our statement that "knowledge of a person's
 
 
 29
 prior criminal involvement (to say nothing of a mere arrest)
 
 
 30
 is alone insufficient to give rise to the requisite
 
 
 31
 reasonable suspicion." Sandoval, 29 F.3d at 542 (emphasis
 
 
 32
 added). Therefore, the magistrate judge correctly noted
 
 
 33
 "[Ms.] Richardson's arrest record ... is a factor that may
 
 
 34
 be considered in forming a basis for reasonable suspicion,
 
 
 35
 [but] it cannot be considered alone."
 
 
 36
 The second fact relied on by Trooper Swain was that Ms. Richardson did not own the car she was driving. Trooper Swain testified this fact brought up "some red flags" and led him to believe he "need[ed] to confirm that it's not a stolen vehicle." Moreover, while Trooper Swain testified under oath that the possibility that the car was stolen was of concern to him, he admitted on cross-examination he did not run a stolen car check on it at that time, and that he waited until later in the day, when he was at the Sheriff's station, to run the stolen car check. He also admitted the result of this check was negative and that the car was registered to Kathy Dyer, as Ms. Richardson had represented to him.
 
 
 37
 Ms. Richardson contends Trooper Swain's decision not to run a contemporaneous stolen car check shows the officer did not truly have a suspicion that she may have been driving a stolen car. While the magistrate judge did not make any specific findings on what weight should be given to Trooper Swain's testimony that he believed the car was stolen in light of his concession that he did not run a stolen car check at that time, we view the evidence in a light favorable to Ms. Richardson. Yet we conclude that the inference sought by Ms. Richardson--that Trooper Swain did not truly believe the car was stolen--does not automatically follow from the testimony.
 
 
 38
 Although Trooper Swain may have believed, as he testified, that he was concerned the car was stolen, the fact he did not run a contemporaneous stolen car check does not inescapably lead to the conclusion he did not genuinely believe this to be a concern. To the contrary, there may have been numerous reasons why he did not run a stolen car check at that time, none of which were discussed at the suppression hearing. In fact, his testimony that he ran the check later that evening lends credence to his testimony that he believed the car was stolen. If he did not believe the car was stolen, then there certainly was no reason for him to run the check several hours after the incident.
 
 
 39
 To be sure, the fact that Ms. Richardson's license and registration were valid presents a less compelling set of circumstances than other cases, where we have found the invalidity of one or both of these documents supported a finding of reasonable suspicion based on a belief the car was stolen. See, e.g., Fernandez, 18 F.3d at 879 (collecting cases). While the facts in this case do not, in and of themselves, permit a finding of reasonable suspicion in light of these cases, it is certainly reasonable for an officer to at least consider the possibility that the vehicle was stolen in deciding whether to continue the detention. Trooper Swain testified that he believed the vehicle might be stolen, and while Ms. Richardson attacks the credibility of this belief, it was nonetheless an entirely permissible factor for Trooper Swain to rely on.
 
 
 40
 The third fact relied on by Trooper Swain was that a computer check of Ms. Richardson revealed the name "Maria Ann Richardson" was an alias for "Marie Ann Erickson." Trooper Swain testified this fact made him suspicious because he "felt like [he] might have a person who was giving [him] a false name." He further testified this fact made him "want[ ] to get an explanation from her about her name.... [A]bout her trip, traveling, and [he] to also ask her about her arrests, because [he] was suspicious at this point that there was drug trafficking taking place." The magistrate judge gave little, if any, weight to this fact, stating it was "insignificant ... in giving rise to reasonable suspicion ... [because] [t]he fact that [Ms.] Richardson had, at one time or another, different last names does not support any reasonable suspicion that she was involved in illegal activity," especially "given the frequency with which women in our society change their names upon marriage." We do not agree with this conclusion.
 
 
 41
 In the context of "drug courier" profiles, the Supreme Court has explicitly recognized law enforcement officers may reasonably consider an individual's use of an alias in the reasonable suspicion determination. See United States v. Sokolow, 490 U.S. 1, 9 (1989). We see no reason why the rationale in Sokolow should be confined to the context of drug courier profiles, and thus hold an individual's alias is a permissible fact that may be considered in deciding whether reasonable suspicion exists during a traffic stop. While Ms. Richardson proffered a plausible explanation for the use of the surname "Erickson," the fact remains that the officer was entitled to rely on the use of this other surname, along with the other facts known to him, in deciding whether there was reasonable suspicion. To the extent the magistrate judge concluded this factor was entitled to no weight in the calculus, this was an erroneous determination under governing precedent.
 
 
 42
 The final fact relied on by Trooper Swain was the "somewhat unusual and to some degree unbelievable" explanation Ms. Richardson gave for her travel itinerary and for why she had Ms. Dyer's car. Trooper Swain testified he believed there were "easier ways to get a two-year old child from Wyoming to California. Kathy [Dyer] could have flown herself. She could have driven herself.... But two round trips to Wyoming just seemed to be unbelievable to me. And so I felt like I was dealing with a suspicious situation." While the magistrate judge acknowledged this itinerary "may have been unusual," he found "it was also plausible for a number of different reasons," namely, the age of Ms. Dyer's child and the possibility that Ms. Dyer was financially unable to afford air travel. See, e.g., Fernandez, 18 F.3d at 878 & n. 3 (acknowledging same).
 
 
 43
 In response, the United States cites to our decisions in United States v. Kopp, 45 F.3d 1450 (10th Cir.), cert. denied, 115 S.Ct. 1721 (1995), and United States v. Sanchez-Valderuten, 11 F.3d 985 (10th Cir.1993), to support its argument that unusual travel plans are another indicia of reasonable suspicion. See Kopp, 45 F.3d at 1453-54; Sanchez-Valderuten, 11 F.3d at 989. While those cases can certainly be distinguished on their facts from what occurred in this case, these distinctions merely raise a question over the weight to be afforded to this fact in the calculus and on the credibility of the officers and the defendants. For example, the defendant in Kopp told the officer he was taking some furniture to a friend in Shreveport. The officer asked if he meant Shreveport, Louisiana, which the defendant responded to by saying he thought they were going to somewhere in North Carolina, where they planned to stay until after Christmas. See Kopp, 45 F.3d at 1451. The officer then spoke to the passenger, who told him they were going to a place near Charlotte, North Carolina, and that they might stay there and look for employment, but that if that was unsuccessful, they would return to California before Christmas. Id. Similarly, in Sanchez-Valderuten, the defendant had been stopped heading eastbound on I-70 in Utah. In response to a question about his travel plans, he told the officer he was going to New York, but that he was moving his family to Washington State. The officer also observed the defendant seemed to evade the question of where he was coming from. Sanchez-Valderuten, 11 F.3d at 987.
 
 
 44
 Concededly, the contradictions and inconsistencies present in those cases are absent in this case. But we are concerned with the legal principle--that unusual travel plans may be considered--and not whether there is a case factually on point to the case at bar. Trooper Swain testified that in his experiences as an officer, the itinerary conveyed by Ms. Richardson, viewed in conjunction with her prior arrest record and the fact she was driving another person's car, led him to believe he was dealing with "a suspicious situation." His subjective perception that this itinerary seemed unusual is, of course, not controlling because our inquiry is an objective one. Yet, in light of the facts known to him at the time and our cases recognizing the validity of reliance on an unusual travel route, we cannot condemn the officer's decision to rely on this fact in deciding whether he believed criminal activity was afoot.
 
 
 45
 In sum, we disagree with the magistrate judge that Trooper Swain's actions were based on nothing more than an unsubstantiated "hunch" or "gut instinct," thereby distinguishing the cases where we have invalidated stops based on speculative, subjective hunches. See, e.g., Fernandez, 18 F.3d at 880-81 (officer's testimony regarding his "sixth sense," his detection of "tension in the air," and his belief something was "afoot," amounted to "an unparticularized hunch [and not] reasonable and objective suspicion"); United States v. Lyons, 7 F.3d 973, 976 (10th Cir.1993) (reliance on a "sixth sense" was nothing more than "the manifestation of a hunch that something foul is afoot"). To the contrary, Trooper Swain did "articulate" factual bases for his suspicions, and he set forth grounds which, when viewed collectively and in light of his expertise and experience as a state trooper, are sufficient to satisfy the requirements of the Fourth Amendment in this context.
 
 
 46
 Ms. Richardson may be correct that each of the facts relied on by Trooper Swain is consistent with innocent travel; however, our analysis must focus on the broader picture, asking whether the sum total of these facts, viewed in light of common sense and with appropriate deference to the officer's expertise, support a determination of constitutionally adequate reasonable suspicion. See Sokolow, 490 U.S. at 9 ("Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion"). We hold that on these facts, a reasonable officer could lawfully detain Ms. Richardson. Therefore, because Trooper Swain's subsequent detention of Ms. Richardson was predicated on reasonable, articulable suspicion, her subsequent consent was not tainted by an illegal detention, and it is therefore valid.[7] As a result, the fruits of the search were lawfully obtained and may be admitted as substantive evidence at trial.
 
 CONCLUSION
 
 47
 The district court's order granting the defendant's motion to suppress is REVERSED and the case is REMANDED to the district court for further proceedings.
 
 McKAY, Circuit Judge, dissenting:
 
 48
 After careful review, I am convinced that the magistrate judge and district court were correct in concluding that Ms. Richardson's consent to a search of her vehicle was vitiated by Officer Swain's lack of a reasonably articulable suspicion. Hence, Officer Swain's detention of Ms. Richardson exceeded the permissible bounds of the Fourth Amendment.
 
 
 49
 The legal question of whether a search is reasonable under the Fourth Amendment is subject to de novo review. United States v. Peters, 10 F.3d 1517, 1521 (10th Cir.1993). A district court's factual findings in a motion to suppress hearing are subject to a clearly erroneous standard of review, and the evidence on appeal is to be viewed in the light most favorable to the district court's findings. United States v. Ibarra, 955 F.2d 1405, 1409 (10th Cir.1992).
 
 
 50
 The court acknowledges that it is supposed to view the evidence in the light most favorable to the district court's findings. It should be noted that the district court wholeheartedly adopted the magistrate judge's findings, stating that "the court finds the Report and Recommendation to be very thorough and comprehensive in its factual findings and legal reasoning and conclusions, and sees no reason to repeat those in this Order." R. Vol. I, No. 49 at 3. Moreover, this court states that "[a]ll of the facts as found by the magistrate judge, and as adopted by the district judge, are supported by the record, and consequently, they are not clearly erroneous." Op. at 3 n. 1. The court, however, overlooks an important factual finding which is a cornerstone of the trial court's conclusions:
 
 
 51
 It is apparent to the Court from visual observation of Richardson that she is of non-Anglo descent. The Court finds that this factor was influential in causing Swain to initiate a Triple-I check based on the following reasons. Swain claimed that he initiated the Triple-I check because Richardson was not the owner of the car and because of the unusual explanation of why she had the car. Swain also testified that he was concerned that the car might be stolen, yet he never asked for a stolen vehicle check until he was back at the police station and following Richardson's arrest. This inconsistency in the procedure followed by Swain in allaying his concerns that the vehicle was stolen, leads the Court to believe that Swain was considering the defendant's ethnicity in deciding to request a Triple-I check
 
 
 52
 R. Vol. I, No. 45 at 13 n. 2 (emphasis added). This factual finding led the magistrate judge to surmise that "Swain's continued detention of Richardson was impermissibly based on a 'hunch' or 'gut instinct,' particularly in light of the defendant's ethnicity, which the Court found to be influential in Swain's decision to initiate a Triple-I check, but not request a stolen vehicle check." Id. at 25-26. While the magistrate judge concluded that Ms. Richardson's stop was not pretexted on her race, the magistrate judge logically inferred that Officer Swain switched his investigation from unlawful speeding to investigation of Ms. Richardson's drug activities because of her race.
 
 
 53
 Just as it is impermissible to base a Terry stop on a person's race, it is impermissible for race to be the reason for shifting the focus of a Terry stop investigation. See United States v. Brignoni-Ponce, 422 U.S. 873, 886-87 (1975) (holding that Hispanic appearance alone is insufficient to justify a stop); United States v. Lopez-Martinez, 25 F.3d 1481, 1487 (10th Cir.1994) (acknowledging that Hispanic appearance by itself cannot create a reasonable suspicion); United States v. Travis, 62 F.3d 170, 173 (6th Cir.1995) ("consensual searches may violate the Equal Protection Clause when they are initiated solely based on racial considerations"); Gonzalez-Rivera v. INS, 22 F.3d 1441, 1447-48 (holding that Hispanic appearance and other factors did not constitute reasonable suspicion), reh'g en banc denied, 37 F.3d 1421 (9th Cir.1994). The court fails to recognize this integral aspect of the trial court's analysis and conclusion that Ms. Richardson's detention violated the Fourth Amendment.
 
 
 54
 The court is correct that Officer Swain's stop of Ms. Richardson for speeding was justified at its inception. The court's analysis, however, fails to recognize that the initially valid stop evolved into an unreasonable detention after Ms. Richardson produced a valid driver's license and registration.
 
 
 55
 Under Terry v. Ohio, 392 U.S. 1 (1968), a law enforcement officer is permitted to make a limited "seizure" of an individual suspected of criminal activity if the officer has "specific and articulable facts which, taken together with reasonable inferences from those facts, reasonably warrant that intrusion." Id. at 21. The reasonable suspicion standard for a brief investigative stop has a lower threshold than the probable cause necessary for an arrest, but under the totality of the circumstances "the officers must have a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.' " United States v. Eylicio-Montoya, 18 F.3d 845, 848 (10th Cir.1994) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). The Supreme Court noted in Brignoni-Ponce that
 
 
 56
 when an officer's observations lead him reasonably to suspect that a particular vehicle may [be involved in criminal activity], he may stop the car briefly and investigate the circumstances that provoke suspicion. As in Terry, the stop and inquiry must be "reasonably related in scope to the justification for their initiation." 392 U.S., at 29.... [H]e may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause.
 
 
 57
 422 U.S. at 881-82. This court has recognized that "[a]n officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir.), cert. denied, 114 S.Ct. 1862 (1994).[8] The Supreme Court, however, has explained that an investigative detention must "last no longer than is necessary to effectuate the purpose of the stop," Florida v. Royer, 460 U.S. 491, 500 (1983), and "[t]he scope of the detention must be carefully tailored to its underlying justification." Id.
 
 
 58
 The magistrate judge found that "at the point that Swain detained Richardson and began asking her questions beyond the scope of the initial stop--for speeding--Swain had in his possession what appeared to be a valid driver's license and registration for the car." R. Vol. I, No. 45 at 23. Officer Swain had elicited enough information from Ms. Richardson--that she had a valid driver's license and lawful possession of the vehicle--to satisfy the purpose of the stop; he had no reasonable suspicion to shift his focus to a drug trafficking investigation. Officer Swain delayed his completion of the speeding citation so he could go off on a fishing expedition regarding Ms. Richardson's last name, her travel itinerary, and her prior arrests. As repeatedly set forth by this court, "When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning." United States v. Sandoval, 29 F.3d 537, 540 (10th Cir.1994) (citing Gonzalez-Lerma, 14 F.3d at 1483). At this point Officer Swain should have issued the speeding citation, terminated the encounter, and allowed Ms. Richardson to go on her way.
 
 
 59
 The final problem with the court's ruling is that it allows the government to twist the reasonable and innocuous circumstances of Ms. Richardson into grounds for what amounted to an unreasonable detention and search. See Reid v. Georgia, 448 U.S. 438, 441 (1980) (conduct or circumstances that "describe a very large category of presumably innocent travelers" is insufficient to constitute a reasonable suspicion). Officer Swain plainly lacked an "appropriate factual basis" for his suspicion, and his stated grounds for his continued detention and investigatory questioning of Ms. Richardson are based on incredibly "inarticulate hunches" that lack any probative value. See Delaware v. Prouse, 440 U.S. 648, 661 (1979).
 
 
 60
 As grounds for reasonable suspicion, the court cites four facts: (1) Officer Swain's knowledge of Ms. Richardson's prior arrest record, (2) the fact she did not own the car she was driving, (3) her description of her travel itinerary, and (4) her additional surname from a previous marriage.
 
 
 61
 The Triple-I check requested by Officer Swain showed that Ms. Richardson had an arrest record, which included drug-related arrests between the period of 1987 and 1990. "[K]nowledge of a person's prior criminal involvement (to say nothing of a mere arrest) is alone insufficient to give rise to the requisite reasonable suspicion" to justify a shift in investigatory focus from the traffic violation to a drug trafficking investigation. Sandoval, 29 F.3d at 542. As we explained in Sandoval,
 
 
 62
 If the law were otherwise, any person with any sort of criminal record--or even worse, a person with arrests but no convictions--could be subjected to a Terry-type investigative stop by a law enforcement officer at any time without the need for any other justification at all. Any such rule would clearly run counter to the requirement of a reasonable suspicion, and of the need that such stops be justified in light of a balancing of the competing interests at stake.
 
 
 63
 Id. at 543. Thus, Richardson's arrest record is a factor of minimal probative value in forming a basis for reasonable suspicion, and it alone does not suffice as reasonable suspicion.
 
 
 64
 The court states that the fact that Ms. Richardson did not own the car she was driving was suspicious. Ms. Richardson was unable to locate the vehicle registration at the request of Officer Swain, but she was able to explain that the car belonged to a "Kathy Dyer" of Casper, Wyoming. Also, Ms. Richardson provided a plausible and consistent account as to why she possessed Ms. Dyer's vehicle. Finally, when Ms. Richardson did locate the vehicle registration, the registration information was consistent with what Ms. Richardson had told Officer Swain.
 
 
 65
 It is not uncommon in American society for people to loan out their automobiles; indeed, bailments comprise a considerable part of personal property law. If Officer Swain were truly concerned that the vehicle was stolen, then why did he fail to run a stolen vehicle check with the vehicle registration, driver's license, and Triple-I checks?[9] Under the totality of the circumstances, it was a rather benign fact that Ms. Richardson possessed Ms. Dyer's car given that her explanation matched the vehicle registration.
 
 
 66
 The court takes a tremendous leap in concluding that Ms. Richardson's travel itinerary was suspicious. Ms. Richardson informed Officer Swain that she was returning to Casper, Wyoming, after having driven Ms. Dyer's two-year-old daughter to California to stay with the child's aunt. Ms. Richardson informed him that she had flown to Casper from California, delivered the child to California in the vehicle, and then would fly back to California from Casper. Given the age of the child, the inability of some people to fly, and the inability of working mothers to take time off from work, Ms. Richardson's travel itinerary was not implausible or suspicious.[10] See United States v. Fernandez, 18 F.3d 874, 878 n. 3 (10th Cir.1994) (concluding that travel plans that avoid flying with children are not a factor contributing to reasonable suspicion).
 
 
 67
 The government and the court label Ms. Richardson's prior surname from her prior marriage as an "alias".[11] The term "alias" implies that someone is assuming a name for a deceptive purpose; to characterize a divorcee's prior name as an alias is specious. Perceiving a divorcee's prior married name as a suspicious circumstance[12] casts a considerable percentage of the American female population into suspicion given the frequency with which women in our society change their names upon marriage. The magistrate judge was correct in finding that "[t]he fact that Richardson had, at one time or another, different last names does not support any reasonable suspicion that she was involved in illegal activity." R. Vol. I, No. 45 at 24.
 
 
 68
 The four factors relied on by the government and court are insufficient to create reasonable suspicion under the circumstances of this case. Each piece of information Ms. Richardson provided Officer Swain was consistent. The travel itinerary, the direction and route of travel, the naming of Ms. Dyer as owner of the car, and the car being registered in Ms. Dyer's name--all of these facts add up to a consistent, plausible story. Officer Swain's continued detention of Ms. Richardson was not justified by "any specific, objective factors supporting a reasonable inference" that the car was stolen, that Ms. Richardson was trafficking in drugs, or that she was committing any other criminal offense. See Fernandez, 18 F.3d at 880.
 
 
 69
 It is clear that the record supports the magistrate judge's finding that Officer Swain's continued investigation was improperly prompted by Ms. Richardson's race. We are bound to defer to that finding under the circumstances of this case. Thus, the court's legal conclusion that reasonable suspicion existed under the circumstances of this case is not supported by the record.
 
 
 70
 For the above stated reasons, I respectfully dissent.
 
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [2]
 All of the facts as found by the magistrate judge, and as adopted by the district judge, are supported by the record, and consequently, they are not clearly erroneous
 
 
 [3]
 As is discussed below, Ms. Richardson denied giving Trooper Swain consent to search her vehicle. The magistrate judge, however, discredited her testimony and accepted the officer's testimony on this issue of fact
 
 
 [4]
 Preliminarily, we note that in the district court, the United States argued Ms. Richardson did not have standing to challenge this search because she was not the owner of the vehicle. See, e.g., United States v. Soto, 988 F.2d 1548, 1552-54 (10th Cir.1993) (discussing the standing doctrine); United States v. Arango, 912 F.2d 441, 444-46 (10th Cir.1990) (same), cert. denied, 499 U.S. 924 (1991). The district court found Ms. Richardson had standing to challenge the lawfulness of a search based on her testimony that she obtained lawful possession of the vehicle with the owner's permission. See, e.g., Soto, 988 F.2d at 1552; Arango, 912 F.2d at 445
 
 
 [5]
 The United States apparently recognizes this fact as it does not contend this subsequent detention devolved into a consensual encounter
 
 
 [6]
 "The government has the burden of demonstrating that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative detention." United States v. Melendez-Garcia, 28 F.3d at 1052 (citation and internal quotations omitted)
 
 
 [7]
 The magistrate judge recognized a conflict in the testimony over whether Ms. Richardson did actually voluntarily consent to the search, but made an explicit credibility determination that she did consent. Mindful that such determinations are for the trial court, see Fernandez, 18 F.3d at 876, and given that this finding is supported by testimony in the record, it is not clearly erroneous
 
 
 [8]
 Computer checks done by an officer in the course of a Terry-stop investigation should have a nexus with the purpose of the stop. The Triple-I check requested by Officer Swain in this case was improper because the magistrate judge found that it was not linked to the stop for speeding
 
 
 [9]
 Officer Swain purportedly ran the Triple-I check to determine whether the vehicle was stolen. A Triple-I check shows whether a person has an arrest record--not whether a vehicle is stolen. Officer Swain did not run a stolen vehicle check until after he returned to the station with Ms. Richardson in custody
 
 
 [10]
 Also, the veracity of Ms. Richardson's travel itinerary was bolstered by the fact that the vehicle was registered to Ms. Kathy Dyer in Casper, Wyoming. Although Officer Swain did not check whether the car was reported stolen, if he had this too would have supported Ms. Richardson's story
 
 
 [11]
 Apparently, during the Triple-I check dispatch reported that "Maria Ann Richardson" was an alias for "Marie Ann Erickson." When questioned about her name by Officer Swain, Ms. Richardson truthfully explained that Erickson had been her first husband's surname
 
 
 [12]
 Even under a totality of the circumstances analysis, some circumstances must be outrightly dismissed as so innocent (or susceptible to varying interpretations) as to be innocuous. See Reid, 448 U.S. at 441 (discounting the probative value of circumstances that describe a very large category of presumably innocent travelers)