**UNITED STATES of America, Plaintiff,**

v.

**Terry L. WOOD, Defendant.**

**No. 95–40025–01–SAC.**

United States District Court,
D. Kansas.

Jan. 10, 1996.

---

Pedro L. Irigonegaray, Irigonegaray & Associates, Topeka, KS, Jerold E. Berger, Topeka, KS, for defendant.

James E. Flory, Office of United States Attorney, Topeka, KS, for plaintiff.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the defendant's following pretrial motions: mo-

tion for discovery of canine records (Dk. 17); motion for discovery, inspection, and disclosure of radio transmission tapes or transcripts of the tapes (Dk. 25); motion for discovery of policy statements and guidelines (Dk. 27); motion to suppress (Dk. 29); motion for discovery of laboratory reports and canine maintenance records (Dk. 31); motion for discovery of canine records of daily field activities (Dk. 39); and motion for evidentiary hearing (Dk. 41). The parties presented arguments and evidence at the hearing held on the afternoon of November 30, 1995, and the parties completed their presentations on the afternoon of December 4, 1995.

The defendant asked for and was granted leave to supplement his memoranda on the issue of a pretextual stop no later than December 15, 1995. By minute order filed December 14, 1995, the court alerted the parties to a recent Tenth Circuit decision, *United States v. Botero–Ospina*, 71 F.3d 783 (10th Cir.1995), and extended their deadlines for filing supplemental briefs in order that they could address the impact of *Botero–Ospina* on the pretextual stop issues here. Having received and reviewed all matters submitted to the court as evidence or memoranda and having conducted independently its own research of the legal issues, the court is ready to rule.

**INDICTMENT**

The defendant is charged with one count of possession with the intent to distribute in excess of 100 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1). The superseding indictment charges specifically:

On or about March 31, 1995, in the District of Kansas, the defendant,

TERRY L. WOOD

did knowingly and intentionally possess with intent to distribute in excess of 100 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(Dk. 3) (footnoted omitted).

**FACTS**

Based on the testimony, videotape and documents submitted at the hearing, the court finds the following facts relevant in its decision on the pending motions. On March 31, 1995, around 5:40 p.m., the defendant, Terry L. Wood, was driving a white 1995 Mercury Marquis in the eastbound lane of I–70 in Trego County, Kansas. Richard L. Jimerson, a trooper with the Kansas Highway Patrol for the last eight years, had just started his shift and had entered I–70 on the westbound lane. The first vehicle seen by Trooper Jimerson was the defendant's car. It was travelling in the eastbound lane approximately two miles west of a construction zone, and it was the only car in the vicinity. Trooper Jimerson observed that the car appeared to be speeding. He attempted to check its speed by radar, but the large concrete overpass nearby prevented the radar from registering a speed. Trooper Jimerson noticed that the car was white and newer and was being operated by a clean-cut white male.

Trooper Jimerson continued driving westbound into a curve for approximately one-half mile. Sure that the defendant now could not see him, Trooper Jimerson slowed, turned around in the median, and proceeded on the eastbound lane. Unable to check the defendant's speed with his radar, Trooper Jimerson accelerated to catch up with the defendant's car so that he could check its speed by stopwatch and by pacing. The defendant's car had entered a construction zone with a posted speed limit of 55 miles per hour by the time Trooper Jimerson was close enough to start the stopwatch. Trooper Jimerson estimated he was approximately a quarter of a mile behind the defendant when he started the stopwatch at mile marker 127. Trooper Jimerson paced the defendant's car for approximately one-half mile. Both the stopwatch and the pacing indicated that the defendant was travelling 67 miles per hour in the construction zone or twelve miles per hour over the posted speed limit. Trooper Jimerson then signalled the car to stop using his patrol car's wigwag headlights and red rotating light. The defendant pulled his car over around six-tenths of a mile past mile marker 128.

The videotape taken by Trooper Jimerson shows him approaching the defendant's car and returning to his car approximately one

minute later. The videotape does not record what was said during this initial conversation. Trooper Jimerson testified that he asked for the driver's license and registration papers, and told Wood that he had been stopped for driving 67 miles per hour in a 55 miles per hour construction zone. Trooper Jimerson said he immediately noticed that the defendant appeared "extremely nervous," as his hands were trembling, his breathing was rapid, and he cleared his throat several times. Trooper Jimerson further testified that he observed sacks from fast food restaurants and a couple of opened maps strewn on the rear floorboard. When he saw a cellular phone with a credit card function attached to the car, Trooper Jimerson said he surmised it was a rental car and asked for the rental papers. Trooper Jimerson also testified that he asked Wood about his travel plans and where he had rented the car. According to Jimerson, Wood said the car had been rented in San Francisco and that he was driving it home to Topeka. The videotape shows that Trooper Jimerson's request for the license and rental agreement and brief questions took less than a minute.

The videotape records the following events and conversations. Trooper Jimerson returned to his patrol car and called dispatch for a computer check on Wood and specifically requested a criminal history or triple I (Interstate Identification Index) check. After calling dispatch, Trooper Jimerson asked Wood to come back to the patrol car. Inside the patrol car, Trooper Jimerson confronted Wood with the rental papers that showed he had rented the car in Sacramento and not San Francisco and that he was to return the car to the Sacramento airport tomorrow. When Wood said he was returning the car to Topeka tomorrow, Jimerson asked if the rental company knew of Wood's plans, and Wood said that the company had a one-way trip policy and that the company knew what his intentions were.

Trooper Jimerson followed up with a question whether Wood had flown into Sacramento. Wood responded affirmatively and then volunteered some of the sights visited on his vacation. Jimerson next laughingly asked Wood about the rental agreement's restriction against travel to Mexico. Jimerson next commented that Wood had received a favorable rental rate and then asked Wood if the car was a 1995 model with low mileage. Wood again answered affirmatively. Jimerson next asked Wood what kind of work he did in Topeka. When Wood said he was a painter, Jimerson asked if this was a vacation time or just a slow season for painting. Wood told him that it was a slow period, that he was drawing unemployment compensation, and that he would start working again in six weeks. Wood then volunteered that his father was a contractor and that he worked for his father. Jimerson next asked Wood if he was "originally from" San Francisco, and Wood told him "no," that he was from Topeka. Jimerson then asked if Wood's sister lived in California, and Wood answered that his sister also lived in Topeka and had accompanied him on the vacation and then returned by plane while he drove back to see the scenery. Wood and Jimerson exchanged some comments about the sights, and then Wood asked Jimerson how his "day was going." After Jimerson answered Wood's question, Wood then talked more about his drive back to Kansas. Jimerson asked Wood about the route he took.

After taking dispatch's call and learning that the triple I check on Wood showed a "5D" or a narcotics arrest, Trooper Jimerson asked Wood if he had ever been arrested. Wood said "yes" in 1984 for drugs. Jimerson asked him if the arrest was for a misdemeanor, and Wood told him it was a felony conviction in Kansas. Jimerson then asked if he had been arrested anywhere else besides Kansas, and Wood said "no." Jimerson then presented Wood with the warning citation and other papers and explained the reason for the lower speed limit in the immediate area. Jimerson told Wood that he was free to go and that he would like to ask him some questions. Before Wood answered Jimerson's request to ask questions, Jimerson inquired if there were drugs in Wood's car. Wood denied that there were any drugs in the car, and then refused Jimerson's subsequent request to search the car. Jimerson told Wood that he believed there might be something in the car and that he was going to get a canine to check the car. Jimerson

told Wood that while he was free to go the car would stay at the scene until the canine search was completed. The videotape shows that less than eight minutes elapsed between the stop and Trooper Jimerson's announcement that he would detain the car for a canine search.

Trooper Jimerson radioed in his request for a canine unit to search the car. Wood repeatedly asked if he could take his contents and leave. Jimerson explained that the car and its contents would stay until sniffed by the canine and that the defendant could wait in his car or in the patrol car or that he could make arrangements to wait at the exit. Trooper Stithem arrived on the scene about this time, and Trooper Jimerson explained the circumstances of the stop and his suspicion for detaining the car for a canine search. The videotape ends here.

Trooper Jimerson testified that Wood sat in his car for about ten or fifteen minutes making calls on the cellular phone. He then came back to the patrol car and told the troopers that he had called his sister who had arranged for someone to pick him up in Wakeeney. Wood accepted Trooper Stithem's offer to drive him to Wakeeney. Approximately fifty minutes after Jimerson's request for a canine unit, Trooper Taylor arrived with a drug-sniffing dog named "Trooper." Shortly after Trooper Taylor and his canine had finished the search, Wood returned to the scene in Trooper Stithem's patrol car.

Trooper Taylor testified that on March 31, 1995, he was called to a traffic stop along I–70 highway to search the exterior of a stopped car with his canine, "Trooper." After preparing the dog for the search, Taylor led the dog around the entire exterior of the car. The dog showed interest or alerted to the trunk area, in particular the trunk seams and underneath the quarter panels. Trooper Taylor described the dog's response as wanting to return to the trunk area and then inhaling deeply at the trunk seams. Based on what he had observed in the dog's response, Trooper Taylor told Jimerson that there was an illegal substance inside the trunk. The officers then searched the trunk and found a suitcase which contained a clear cellophane bag with two separate round balls of what appeared to be methamphetamine. Field tests confirmed it was methamphetamine.

## MOTIONS TO DISCOVER CANINE RECORDS (Dks. 17, 31, and 39)

By his motions, the defendant seeks to discover: (1) all training, testing or certification documents for "Trooper," (2) all records showing "Trooper's" performance including incidents of false-positive alerts and accurate-positive alerts and the number of each; (3) all medical or veterinary records of "Trooper;" (4) all weekly maintenance and/or structured maintenance training records for "Trooper;" and (5) all records and documentation of all field activities of "Trooper" including every instance where "Trooper" has alerted and whether the alert was accurate positive or false positive. At the hearing, the defendant's counsel referred to the police service dog report prepared in this search, Exhibit D4, and specifically requested the same reports prepared in all actual field searches conducted by "Trooper." The defense counsel opines that without these records the court is unable to assess the reliability of "Trooper" and, thus, to determine if "Trooper's" positive response here provided the officers with probable cause to search the defendant's car trunk. In response to these requests, the government has agreed to furnish the records of "Trooper's" certification and re-certifications and of "Trooper's" structured training over a reasonable time period. (Dks. 21 and 34). The government opposes the other requests as not supported by a showing of materiality and as thinly veiled attempts at a fishing expedition.

■ As reflected in the titles used for two of his motions, (Dks. 31 and 39), Wood grounds his request for the above documents on Rule 16 of the Federal Rules of Criminal Procedure. Wood's motions violate the court's Procedural Guidelines at I.A. and I.B. They are not "accompanied by a separate concise memorandum citing all authorities and stating with particularity all legal and factual arguments upon which the movant ... relies." The court's Guideline at I.A. further specifies the consequence for such a violation: "A motion not accompanied by a

memorandum may be summarily denied." The defendant's motions also do not disclose whether defense counsel and government counsel "conferred and were unable to agree upon production of the requested information." The court may summarily deny a motion brought in violation of Guideline I.B. *See United States v. Holveck*, 867 F.Supp. 969, 973 (D.Kan.1994). The court denies the defendant's motions based in part on the violations of the court's Criminal Procedural Guidelines.

■ Rule 16(a)(1)(C) provides in pertinent part:

> Upon request of the defendant the government shall permit the defendant to inspect and copy ... books, papers, documents, ... tangible objects, ... which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

The defendant cannot rely on conclusory allegations or on a general description of the requested information, but must make a prima facie showing of materiality to obtain the requested information. *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir.1990); *see United States v. Phillip*, 948 F.2d 241, 250 (6th Cir.1991), *cert. denied*, 504 U.S. 930, 112 S.Ct. 1994, 118 L.Ed.2d 590 (1992). To be "material" for purposes of this rule, the requested information must have "more than ... [an] abstract logical relationship to the issues." *United States v. Ross*, 511 F.2d 757, 762 (5th Cir.) (citation omitted), *cert. denied*, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975). "There must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." *Id.* at 763. The materiality requirement typically " 'is not a heavy burden,' rather, evidence is material as long as there is a strong indication that ... [the evidence]" "will 'play an important role in uncovering

admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.' " *United States v. Lloyd*, 992 F.2d 348, 351 (D.C.Cir.1993) (quoting *United States v. George*, 786 F.Supp. 56, 58 (D.D.C.1992)).[1] Stated simply, the defendant must come forth with facts tending to show "that the Government is in possession of information helpful to the defense." *Mandel*, 914 F.2d at 1219 (citation omitted).

The requested records and documentation qualifies for analysis under Rule 16(a)(1)(C). *United States v. Ollison*, No. 92–CR–365, 1995 WL 12300, at *6 n. 8, 1995 U.S. Dist. LEXIS 207, at *21 n. 8 (N.D.Ill. Jan. 11, 1995). Wood's showing of materiality, however, does not rise above mere conclusory allegations. Based in part on Wood's failure to make a prima facie showing of materiality, the court denies the defendant's motions for any records beyond those the government has said it would produce.

■ The materiality of the requested records depends principally on the nature and degree of the inquiry required when probable cause depends, in part, on a positive alert by a trained narcotics dog. May a court accept the positive alert of a trained and currently certified narcotics dog as reliable enough for probable cause when there are no apparent circumstances or reasons for questioning the canine's reliability? Or, must a court in every case make a detailed inquiry into the alerting dog's reliability that goes beyond the fact that the dog was trained and certified? In this court's opinion, these remain open questions in the Tenth Circuit. In an earlier case, a defendant challenged an affidavit as insufficient to show probable cause when it only stated that the dog was a "trained, certified marijuana sniffing dog." See *United States v. Venema*, 563 F.2d 1003, 1007 (10th Cir.1977). The Tenth Circuit upheld the affidavit on the rationale that "trained" means the dog has the ability to sniff out drugs as a result of experience and training. *Id.*

---

1. As has been observed, materiality is a standard that may vary with the particular relevance of the requested information, the burden in producing it, the national or privacy interests surrounding it, and its availability from other sources. *United States v. George*, 786 F.Supp. 56, 58 (D.D.C.1992).

In a later case, a defendant sought the pretrial production of " 'training records, veterinary records, false-positive/false-negative alert records and all other records establishing the dog's ability to smell,' " arguing the dog had been recovering from a serious injury and initially false-alerted on contact with the defendant's car. *United States v. Gonzalez–Acosta,* 989 F.2d 384, 388 (10th Cir.1993). At the suppression hearing, the dog handler testified that despite the dog's recent injury it was recertified approximately three weeks before the search and that the dog had never false-alerted during its three years of work. Except for the canine log on the day of the search, the trial court denied the defendant's motion for pretrial production of records. The Tenth Circuit affirmed:

First, we do not believe the documents were relevant because the dog was certified on the day in question and because the dog properly alerted to the presence of contraband. (citations omitted). Indeed, had the dog's records indicated it had false-alerted in the past, defendant's ability to cross-examine would not have been enhanced because there is no doubt it correctly alerted in this instance. Moreover, based on defense counsel's extensive cross-examination of Agent Pena [the dog handler] at the suppression hearing, we simply cannot say the defendant was precluded from either preparing for the suppression hearing or from exploring the issue of dog reliability.

989 F.2d at 389.

The most recent Tenth Circuit decision bearing on these questions is *United States v. Ludwig,* 10 F.3d 1523 (10th Cir.1993). The defendant there argued that dog sniffs are not as reliable as courts often assume, that mistaken dog alerts occur, and therefore, that positive dog alerts do not provide probable cause. The trial court rejected the arguments, and the Tenth Circuit affirmed:

Probable cause means that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). Although Ludwig cites several cases of mistaken dog alerts, a dog alert usually is

at least as reliable as many other sources of probable cause and is certainly reliable enough to create a "fair probability" that there is contraband. We therefore have held in several cases that a dog alert without more gave probable cause for searches and seizures. (citations omitted). A dog alert might not give probable cause if the particular dog had a poor accuracy record, but the evidence shows that the dog in this case has never falsely alerted. R.Vol. II at 13.

10 F.3d at 1528.

A federal district court recently read *Ludwig* to hold that the Tenth Circuit had "joined other circuits who have acknowledged that finding probable cause is contingent on the reliability of the alerting dog." *United States v. Florez,* 871 F.Supp. 1411, 1417–18 (D.N.M.1994) (citing cases from the Sixth, Ninth and Fifth Circuits as comprising the other circuits). There is no question that the panel in *Ludwig* spoke of dog alerts in general as a reliable source. The panel, however, did not speak to what establishes this reliability and whether this must be proved in each case. More importantly, the panel did not say that the alerting dog's reliability was contingent on more than the fact that the dog had been trained and certified. Indeed, if it had, then an en banc overruling of *Venema* and *Gonzalez–Acosta* would have been required. At most, the panel in *Ludwig* recognizes that there may be circumstances that so undermine a particular dog's reliability as to affect the probable cause determination.

The Sixth Circuit in *United States v. Diaz,* 25 F.3d 392, 394 (6th Cir.1994), said that a positive dog alert does not establish probable cause absent proof that the dog is trained and reliable. Noting that the quality and quantity of proof necessary to demonstrate a canine's training and reliability were open questions, the Sixth Circuit analogized the situation to expert witnesses where certain proof is first required to show qualifications and all other proof is then viewed as going to credibility. *Id.* "When the evidence presented, whether testimony from the dog's trainer or records of the dog's training, establishes that the dog is generally certified

as a drug detection dog, any other evidence, including the testimony of other experts, that may detract from the reliability of the dog's performance properly goes to the 'credibility' of the dog." *Id.*

In *Florez,* the district court analogized a dog alert to an informant's tip [2] requiring the court to assess the informant's reliability and basis of knowledge in light of the totality of the circumstances. 871 F.Supp. at 1420. "The fact that a dog is certified should not be sufficient in and of itself to establish probable cause." *Id.* In *Florez,* the court suppressed the evidence because the dog handler's records regarding the dog's success rate were incomplete and the dog handler's testimony on the dog's reliability was not sufficiently credible. 871 F.Supp. at 1422–24.

The Fifth Circuit in *United States v. Williams,* 69 F.3d 27, 28 (5th Cir.1995), held that "[b]ecause a showing of the dog's reliability is unnecessary with regard to obtaining a search warrant, *a fortiori,* a showing of the dog's reliability is not required if probable cause is developed on site as a result of a dog sniff of a vehicle." In short, the Fifth Circuit said there is no requirement that the government show the dog's past reliability in sniffing drugs.

 That trained and certified dogs may occasionally make false alerts is a fact, which in this court's opinion, does not detract from the accepted notion that a certified dog's alert creates a "fair probability" of contraband being present. Both Tenth Circuit and Fifth Circuit precedent recognize that a probable cause showing must at a minimum prove that the dog is trained and currently certified. There may be circumstances where a more complete investigation is required, because the reliability presumed from certification and training is subject to

question. These may include that the dog's training or certification was substandard, that the health of the dog was such as to possibly affect reliability, and that the circumstances of the particular search raise issues regarding the dog's reliability.

In the instant case, the court is satisfied that at the time of the search "Trooper" was adequately trained and certified and was in good health. There are no circumstances about this particular search that raise a question of "Trooper's" reliability as a drug-detecting canine. The training records for "Trooper" show he was subjected to regular field testing and his performances were graded. Trooper Taylor testified that "Trooper" had been his drug dog since May of 1992 and that he has positively alerted between fifteen and twenty times under actual work conditions. Taylor described "Trooper" as "very reliable." The defendant's counsel through extensive cross-examination did show that Trooper Taylor made errors or omissions on one or more of the training records kept on "Trooper." Neither that testimony nor the records themselves suggest any reasonable ground for questioning "Trooper's" reliability.

The court permitted full cross-examination of Trooper Taylor into all relevant aspects of "Trooper's" performance and reliability. The government provided all documents the court deems relevant and necessary for this cross-examination. In the absence of some other circumstance requiring a more detailed inquiry into "Trooper's" reliability, the court will not require the government to produce the police service dog reports prepared on "Trooper's" other searches or any other records of his performance. The court, therefore, grants the discovery motions only as to the records that the government already has

---

**2.** Without necessarily taking sides on the best analogy debate, the instant court sees a positive alert from a law enforcement dog trained and certified to detect narcotics as inherently more reliable than an informant's tip. Unlike an informant, the canine is trained and certified to perform what is best described as a physical skill. The personal and financial reasons and interests typically behind an informant's decision to cooperate can hardly be equated with what drives a canine to perform for its trainer. The reliability of an informant is really a matter of forming an

opinion on the informant's credibility either from past experience or from independent corroboration. With a canine, the reliability should come from the fact that the dog is trained and annually certified to perform a physical skill. When the annual certification process involves actual field testing and grading of the canine's drug-detection skills, in this court's judgment, the canine's reliability is sufficient for a probable cause determination absent some circumstance that justifies a more complete examination of the canine's skills and performance.

agreed to produce and denies the motions in all other respects.

## MOTION FOR DISCOVERY, INSPECTION, AND DISCLOSURE OF RADIO TRANSMISSION TAPES OR TRANSCRIPTS (Dk. 25)

In his motion, the defendant seeks the radio transmission tapes and any available transcripts of the same recording Trooper Jimerson's transmissions from when he first saw the defendant driving the white Mercury Marquis on March 31, 1995, through the defendant's arrest. The government responds that the Kansas Highway Patrol has destroyed these tapes, as no request to retain these tapes was made within thirty days. At the hearing, the defendant's counsel conceded the motion was moot in light of the government's response. The court denies this motion as moot.

## MOTION FOR DISCOVERY OF POLICY OR GUIDELINES FOR PROFILE STOPS OR ARRESTS (Dk. 27)

The defendant seeks copies of all policy statements, guidelines, correspondence, memoranda, or other material provided to the Kansas Highway Patrol officers here concerning arrests, stops or investigations predicated on appearances or profiles of individuals. The defendant cites Rule 16 in his motion and briefly argues the material is necessary "to establish the basis for the pretextual stop theory." (Dk. 27 at 2). The government opposes the request as a fishing expedition saying the defendant offers no arguable basis for a pretextual stop.

■ As will be discussed in the next section of this order, the Tenth Circuit in *United States v. Botero–Ospina*, 71 F.3d 783 (10th Cir.1995), recently abrogated the pretextual stop challenge that is the basis of the defendant's evidentiary request. Despite the defendant's arguments to the contrary, the court does not consider the Kansas Highway Patrol's policy or guidelines on profile stops or arrests material in judging the credibility of Trooper Jimerson's testimony that the defendant was travelling in excess of the posted speed limit before being stopped. The court denies the defendant's discovery request for a lack of materiality.

## MOTION TO SUPPRESS (Dk. 29)

The defendant seeks to suppress all physical evidence seized from his person or the car that he was driving, any testimony concerning such evidence, and all statements or admissions he made after his arrest as fruits of an unlawful detention and search. Although his original motion to suppress does not include pretextual stop as an issue, the defendant refers to this theory in his discovery motions, supplemental memorandum, and oral argument at the suppression hearing. The court breaks down the motion and other arguments into the following issues:

(1) Did Trooper Jimerson have reasonable suspicion to stop Wood for a traffic violation?

(2) Did Trooper Jimerson make a pretextual stop?

(3) Did Trooper Jimerson unreasonably detain Wood?

(4) Did Trooper Jimerson have probable cause to search Wood's car?

### *REASONABLE SUSPICION TO STOP*

■ The Fourth Amendment protects against unreasonable searches and seizures. *United States v. McSwain*, 29 F.3d 558, 561 (10th Cir.1994); *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir.1990), *cert. denied*, 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991). "The stopping of a vehicle and the detention of its occupants constitute a 'seizure' within the means of the Fourth Amendment. An ordinary traffic stop is a limited seizure, however, and is more like an investigative detention than a custodial arrest." *United States v. Walker*, 933 F.2d 812, 815 (10th Cir.), *reh'g denied*, 941 F.2d 1086 (10th Cir.1991), *cert. denied*, 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992); *see United States v. Gonzalez–Lerma*, 14 F.3d 1479, 1483 (10th Cir.) ("A traffic stop is an investigative detention analogous to a *Terry*-stop.") (citing *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir.1993)), *cert. denied*, —— U.S. ——, 114 S.Ct. 1862, 128 L.Ed.2d 484 (1994); *United States v. Sanchez*, 866 F.Supp. 1542, 1550 (D.Kan.1994). The principles governing investigative detentions found in *Terry v. Ohio*, 392 U.S. 1, 20,

88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968), require a two-fold inquiry into the reasonableness of the detention: first, "whether the officer's action was justified at its inception," and second "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879.

 "[A] brief investigative stop only requires 'some objective manifestation that the person stopped is ... engaged in criminal activity.'" *United States v. Eylicio–Montoya*, 18 F.3d 845, 848 (10th Cir.1994) (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981)). "[I]n light of the totality of the circumstances, the officers must have a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* In short, only an articulable and reasonable suspicion of criminal conduct is necessary for an investigative stop of an automobile. *United States v. Arzaga*, 9 F.3d 91, 93 (10th Cir.1993).

 The court finds Trooper Jimerson's testimony about the traffic stop credible in all relevant respects. The court has no difficulty believing that a trained and experienced highway patrol trooper is able to make a reasonable estimate of a car's speed by simple observation and also is able to time a car from a distance of approximately a quarter of a mile away. There is no credible evidence in the record to suggest the contrary. More importantly, there is nothing of record which even suggests that Wood was not speeding. In fact, the videotape shows that when Wood climbed into the patrol car with Jimerson, he asked if he was driving about "five miles over."

The calculations of Professor Reece do not show that Trooper Jimerson's estimates are implausible. By Reece's calculations, Jimerson had to have been six-tenths to nine-tenths of a mile away, instead of a quarter of a mile away, from Wood's vehicle when he started the stopwatch. For his calculations, Reece assumed any number of facts that could significantly affect the results of his calculations. One example is that Reece assumed that after seeing the speeding vehicle, Jimerson continued to travel fifty-five miles

per hour in a sixty-five miles per hour zone for a full one-half mile before turning around in the median. Jimerson never testified that he continued to drive at fifty-five miles per hour. Another criticism of Reece's calculations is that Reece did not adjust all the rate of speed and distance factors upward or downward to reasonably account for the fact that they were really just estimates. In short, the court is not persuaded that Reece's calculations show Jimerson's testimony about Wood's speed and his ability to measure it was improbable or implausible. Based on all the evidence, the court finds that once Trooper Jimerson had determined that Wood was speeding, he had a particularized and reasonable suspicion to stop Wood's car.

## PRETEXTUAL STOP

Until recently, the law in the Tenth Circuit was that a pretextual stop was not justified at its inception and, therefore, violated the Fourth Amendment. *United States v. Guzman*, 864 F.2d 1512, 1515 (10th Cir.1988). "A pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the 'reasonable suspicion necessary to support a stop.'" *Arzaga*, 9 F.3d at 93 (quoting *United States v. Guzman*, 864 F.2d at 1515.) Simply put, a pretextual stop is one that is ostensibly made for a lawful reason but this reason is really a pretext for another reason that is impermissible. *United States v. Maestas*, 2 F.3d 1485, 1489 (10th Cir.1993). " 'The classic example, presented in this case, occurs when an officer stops a driver for a minor traffic violation in order to investigate a hunch that the driver is engaged in illegal drug activity.'" *United States v. Castillo*, 864 F.Supp. 1090, 1094 (D.Utah 1994) (quoting *Guzman*, 864 F.2d at 1515).

 In the recent case of *United States v. Botero–Ospina*, 71 F.3d 783 (10th Cir.1995), the Tenth Circuit, sitting en banc, concluded that the "*Guzman* standard is unworkable," and adopted "a new standard ...: a traffic stop is valid under the Fourth Amendment if the stop is based on an ob-

served traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." 71 F.3d at 787. Under the new standard, an initial traffic stop is constitutionally valid so long as the officer had reasonable suspicion to believe the defendant violated a traffic or equipment regulation. *United States v. Randy Alan Parker, John Arthur Sorenson,* 72 F.3d 1444, 1448 (10th Cir.1995). It is now irrelevant whether: (1) " 'the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop' "; and (2) "the officer may have had other subjective motives for stopping the vehicle." *Botero–Ospina,* 71 F.3d at 787 (quoting *United States v. Ferguson,* 8 F.3d 385, 391 (6th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 97, 130 L.Ed.2d 47 (1994)); *see also Parker,* 72 F.3d at 1448. By reason of holding that Trooper Jimerson had reasonable suspicion to stop Wood for speeding, the court's inquiry under the first prong of *Terry* is complete,[3] and the defendant's arguments concerning Jimerson's other motives or reasons for the initial stop are irrelevant.

### REASONABLE DETENTION

■ The second prong of *Terry* addresses whether the officer's action "was reasonably related in scope to the circumstances that first justified the interference." *Gonzalez–Lerma,* 14 F.3d at 1483 (citing *Terry v. Ohio,* 392 U.S. at 20, 88 S.Ct. at 1879 (1968)). "A *Terry* stop must 'last no longer than is necessary to effectuate the purpose of the stop,' *Florida v. Royer,* 460 U.S. 491, 500,

[103 S.Ct. 1319, 1325, 75 L.Ed.2d 229] (1983), and its scope 'must be carefully tailored to its underlying justification.' *Id.*" *United States v. Massie,* 65 F.3d 843, 847 (10th Cir.1995) (citation omitted).

■ The officer making a routine traffic stop may request a driver's license and vehicle registration, run a computer check on the car and driver, and issue a citation or warning. *United States v. Jones,* 44 F.3d 860, 872 (10th Cir.1995); *United States v. Soto,* 988 F.2d 1548, 1555 (10th Cir.1993). "Once the driver has produced a valid license and proof that he is entitled to operate the car, 'he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.' " *United States v. Walker,* 933 F.2d at 816.

Wood complains here that Trooper Jimerson's questions about the rental car, itinerary, travel plans, and occupation were intrusive and offensive and asked without reasonable suspicion. All of these questions were asked while Trooper Jimerson waited for dispatch to report the results of the requested computer check.

■ Though it has been said that "concurrent detentions for questioning are justified only when the officer has 'reasonable suspicion,' " *United States v. Jones,* 44 F.3d at 872 (citation omitted), and that questions unrelated to the traffic stop took the detention to "a new phase," *United States v. Soto,* 988 F.2d at 1555, the Tenth Circuit in these situations was dealing with objectionable questions related to the transportation or possession of firearms, contraband or drugs.[4]

3. Even if the Tenth Circuit had not abandoned the pretextual stop challenge, this court would have rejected any such challenge here, for the defendant never introduced any evidence of another motive for the stop. "Absent introduction of any rationale for the stop outside the parameters of the traffic violations, the stop cannot, by definition, be called 'pretextual.' " *United States v. Horn,* 970 F.2d 728, 731 (10th Cir.1992).

4. There is authority in Fifth Circuit precedent and some basis in Tenth Circuit precedent for arguing that the second prong is principally concerned with the length of the detention and that an officer's actions unrelated to the justification for the initial stop do not necessarily violate the Fourth Amendment. An officer asking a question, even if unrelated to the stop, does not by itself amount to a Fourth Amendment violation. *United States v. Shabazz,* 993 F.2d 431, 436 (5th Cir.1993). Questioning is not a seizure. *Florida v. Bostick,* 501 U.S. 429, 433, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389, 398 (1991). The second inquiry under *Terry* focuses on the lawful duration of the original detention. A valid initial stop can become unreasonable at some point. *United States v. Rivera,* 867 F.2d 1261, 1263 (10th Cir. 1989). "In a garden variety *Terry* stop, the nature of the questioning during a later portion of the detention may indicate that the justification for the original detention no longer supports its continuation." *Shabazz,* 993 F.2d at 436. If the questioning does not extend the duration of the original detention, there is no Fourth Amend-

In contrast, the Tenth Circuit has approved of routine inquiries into a driver's destination, occupation, and relationship with a passenger, in the absence of reasonable suspicion. *See, e.g., United States v. Rivera,* 867 F.2d 1261, 1262–63 (10th Cir.1989) (officer "could legitimately ask questions relating to the identity and travel plans of" the defendants, including their relationship); *United States v. Turner,* 928 F.2d 956, 958 (10th Cir.), *cert. denied,* 502 U.S. 881, 112 S.Ct. 230, 116 L.Ed.2d 187 (1991) (officer asked about destination and driver's occupation); *see United States v. Torres–Morales,* Nos. 94–4008, 94–4014, 52 F.3d 339, 1995 WL 230319, at **2 (10th Cir. Apr. 18, 1995) (Table case) (officer did not need reasonable suspicion to question driver about contents of truck, purpose of trip, destination, and address of destination), *cert. denied,* —— U.S. ——, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995). When the officer's inquiry evolves into the transportation of contraband, to drug-related matters or to prior arrests, the Tenth Circuit has said that such inquiry was justified only if the officer reasonably suspected that the defendant was transporting drugs or contraband. *See, e.g., United States v. Richardson,* No. 95–4039, 69 F.3d 549, 1995 WL 623377 at *5–6, 1995 U.S.App. LEXIS 28814 at *15–*17 (10th Cir. Oct. 13, 1995) (reasonable suspicion to question about surnames and arrest record); *United States v. Jones,* 44 F.3d 860, 872 (10th Cir.1995) (reasonable suspicion to inquire about transportation of contraband); *United States v. Betancur,* 24 F.3d 73, 78 (10th Cir.1994) (reasonable suspicion to ask drug-related questions); *see also United States v. Sharpe,* 845 F.Supp. 791, 794–95 (D.Kan.1994).

Trooper Jimerson's initial questions relating to the rental car, itinerary, travel plans, and occupation were brief and more akin to casual conversation than any interrogation. Such questions were permissible conversation during a routine stop and did not take the investigative detention into a new phase.[5]

Based on the Tenth Circuit precedent cited above, the court concludes that Trooper Jimerson's questions concerning Wood's prior drug arrest were justified only if Jimerson had a reasonable suspicion that Wood was transporting drugs. Delay or detention caused by additional questioning on matters unrelated to the initial stop is justified in two circumstances. *United States v. Gonzalez–Lerma,* 14 F.3d at 1483. One is where the original detention has ended and the questioning is conducted during a consensual encounter. *United States v. McKneely,* 6 F.3d 1447, 1450–51 (10th Cir. 1993). The government does not argue a consensual encounter here, nor do the facts support a finding of one. Trooper Jimerson had not returned the driver's license or papers to Wood before questioning him about his prior drug arrest. *See United States v. McKneely,* 6 F.3d at 1451. The other circumstance justifying additional questions is where the officer asks the questions on the basis of " 'objectively reasonable articulable suspicion' of illegal activity." *United States*

---

ment violation. *Id.; United States v. Morales–Zamora,* 914 F.2d 200, 203 (10th Cir.1990) (Because the defendants' car was not detained longer than necessary to complete the examination of papers at a roadblock detention, there was no "seizure" for the canine sniff that was accomplished during the initial valid detention.) Consequently, questions asked while waiting for computer check results or completing necessary paperwork do not delay the stop beyond the time necessary to issue a citation. *See, e.g., United States v. Crain,* 33 F.3d 480, 485 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1142, 130 L.Ed.2d 1102 (1995); *Shabazz,* 993 F.2d at 437; *United States v. Walker,* 933 F.2d 812, 816 n. 2 (10th Cir.1991); *United States v. Torres,* No. 92–4061, unpub. op. 1993 WL 330616, 1993 U.S.App. LEXIS 22380 (10th Cir. Sep. 1, 1993).

5. Even if such questions could only be asked upon reasonable suspicion, Trooper Jimerson was justified in asking about Wood's lawful authority to operate the rental car. Wood presented a Kansas driver's license, yet he was driving a car with California license plates. Wood told Jimerson he had rented the car in San Francisco when the rental agreement indicated Sacramento. Another red flag was that the rental agreement showed the car was to be returned to the Sacramento airport the next day, but Wood said that he was just leaving the car in Topeka. Because officers are allowed "to graduate their responses to the demands of any particular situation," *United States v. Place,* 462 U.S. 696, 709 n. 10, 103 S.Ct. 2637, 2646 n. 10, 77 L.Ed.2d 110 (1983), Trooper Jimerson properly escalated his inquiry into the circumstances surrounding Wood's rental, use, and return of the car.

*v. Sanchez–Valderuten,* 11 F.3d 985, 989 (10th Cir.1993) (quoting *United States v. Soto,* 988 F.2d at 1554).

 The determination whether objectively reasonable suspicion of illegal activity existed "does not depend upon any one factor, but on the totality of the circumstances." *United States v. Soto,* 988 F.2d at 1555 (citations omitted). " 'Police officers need not close their eyes to suspicious circumstances.' " *United States v. Pena,* 920 F.2d at 1514 (quoting *United States v. Espinosa,* 782 F.2d 888, 891 (10th Cir.1986)). Officers are allowed "to graduate their responses to the demands of any particular situation." *United States v. Place,* 462 U.S. 696, 709 n. 10, 103 S.Ct. 2637, 2646 n 10, 77 L.Ed.2d 110 (1983). At the same time, suspicions or hunches that are inchoate and unparticularized do not rise to the level of reasonable suspicion. *United States v. Fernandez,* 18 F.3d at 878.

 In evaluating the evidence under the reasonable suspicion standard, the court is mindful of the deferential approach that is to be taken:

Courts are to view the officer's conduct through a filter of "common sense and ordinary human experience," *United States v. Melendez–Garcia,* 28 F.3d 1046, 1052 (10th Cir.1994) (citation omitted), and in light of "the totality of the circumstances," *United States v. Fernandez,* 18 F.3d 874, 878 (10th Cir.1994). This approach is intended to "avoid unrealistic second-guessing of police officers' decisions," *Melendez–Garcia,* 28 F.3d at 1052 (citation omitted), and to accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions, *United States v. Lopez–Martinez,* 25 F.3d 1481, 1484 (10th Cir.1994).

*United States v. Alvarez,* 68 F.3d 1242, 1244 (10th Cir.1995).

 The defendant argues that his Fourth Amendment rights were first violated when Trooper Jimerson questioned him about the prior drug arrest before returning his driver's license and other papers. The court finds there were specific articulable facts that in the aggregate constituted reasonable suspicion to sustain this additional questioning.

 It is unusual for a person to travel with a family member one way in a commercial airplane from Topeka, Kansas, to California and then to drive by himself back to Topeka in a car rented in California. The suspicion caused by such travel plans is heightened when the person wrongly identifies the California city where the car was rented and later promptly admits it was the California city shown on the car rental papers. Unusual travel plans are an indicia of reasonable suspicion, particularly when there are contradictions and inconsistencies in them. *United States v. Richardson,* 1995 WL 623377, at \*8–9, 1995 U.S.App. LEXIS, at \*23–\*24; *see, e.g., United States v. Kopp,* 45 F.3d 1450, 1453–54 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 1721, 131 L.Ed.2d 579 (1995); *United States v. Sanchez–Valderuten,* 11 F.3d at 989. It does not seem likely or plausible that an unemployed painter in Kansas could afford to take a two-week vacation in California, to fly there one-way in a commercial airplane, to rent a 1995 Mercury Marquis in California, and then to drive the rental car back to Kansas. *United States v. Turner,* 928 F.2d at 959 (facts comprising reasonable suspicion included the inconsistency between the defendant's well-manicured hands, attire and expensive compact disc collection and his stated occupation of auto mechanic). Though only a routine traffic stop for speeding, the defendant acted extremely nervous which Trooper Jimerson observed in the defendant's rapid breathing, trembling hands, and constant clearing of throat. *See, e.g., United States v. Soto,* 988 F.2d at 1556 (reasonable suspicion to justify additional questioning when defendant acted nervous and could not provide address of uncle from whom he said he had borrowed the truck). It is true that nervousness alone generally does not amount to reasonable suspicion, but it is a factor to consider and its weight depends on the totality of the circumstances. *See id.* The fast food bags and open maps strewn about the car indicated the driver was eating on the run and was in a hurry to reach his destination. The defen-

dant's arrest for drugs is another factor to consider, but it is "alone insufficient to give rise to the requisite reasonable suspicion." *United States v. Sandoval,* 29 F.3d 537, 542 (10th Cir.1994). The court finds that these factors taken together amount to reasonable suspicion sufficient to ask additional questions about the prior drug arrest and other drug-related matters, to seek consent to search, and to detain the car while a canine search was conducted.

■ The remaining inquiry under this issue is whether the duration of the detention of Wood's rental car was unreasonable. "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion). In *United States v. Place,* 462 U.S. 696, 706, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983), the luggage was seized for ninety minutes during which it was taken to a narcotics dog. Because the police had known of the defendant's arrival time and had ample time to arrange for the dog to be more readily available, the Court held:

> The length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause. . . . [T]he brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justified on reasonable suspicion.

462 U.S. at 709, 103 S.Ct. at 2645. In *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985), approximately thirty to forty minutes elapsed between the stop and the arrest, and the Supreme Court rejected an outside time limitation of twenty minutes for a proper *Terry* stop. The Court reasoned:

> Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop. But our cases impose no rigid time limitation on *Terry* stops. . . . [W]e have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes. (citations omitted) Much as a "bright line" rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria. . . .

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

470 U.S. at 685–686, 105 S.Ct. at 1575.

■ This is not a case where the officer knowing of the defendant's travel plans should have planned for additional investigatory techniques. In fact, Trooper Jimerson and the other officers appear to have acted diligently and promptly in investigating their suspicions. The actual canine sniff does not appear to have been time consuming, and the delay caused to obtain the narcotics dog was reasonable particularly considering the rural area where the search and seizure occurred. The troopers attempted to create circumstances where the defendant would not be detained waiting for his car. They allowed him to use the cellular phone in his car and then later drove him to town so he could met a friend for a ride. When the meeting did not occur, the defendant then asked for a ride back to his car. Under all these circumstances, the court does not find that the duration of the detention was unreasonable.

## PROBABLE CAUSE

■ The alert of a trained and certified narcotics-detection canine, by itself, provides probable cause to believe the car contains narcotics. *United States v. Massie,* 65 F.3d at 849; *United States v. Ludwig,* 10 F.3d at 1527; *United States v. Morales–Zamora,* 914 F.2d at 205. The court will not rehash the arguments and issues discussed earlier. The court reiterates its finding that "Trooper's" alert on Wood's vehicle justified the search.

IT IS THEREFORE ORDERED that the defendant's motions to discover canine rec-

ords (Dks. 17, 31, and 39) are granted only as to those records that the government has produced and are denied in all other respects;

IT IS FURTHER ORDERED that the defendant's motion for discovery, inspection, and disclosure of radio transmission tapes or transcripts (Dk. 25) is denied as moot;

IT IS FURTHER ORDERED that the defendant's motion for discovery of policy or guidelines for profile stops or arrests (Dk. 27) is denied;

IT IS FURTHER ORDERED that the defendant's motion to suppress (Dk. 29) is denied;

IT IS FURTHER ORDERED that the defendant's motion for an evidentiary hearing (Dk. 41) is granted insofar as the court heard the evidence and arguments that were presented at the hearing held on the afternoons of November 30, 1995, and December 4, 1995.