42 F.3d 1406
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Gary CARTER, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Timothy CARTER, Defendant-Appellant.
 Nos. 94-2081, 94-2082.
 United States Court of Appeals, Tenth Circuit.
 Dec. 6, 1994.
 ORDER AND JUDGMENT[1]
 
 1
 Before ANDERSON and LOGAN, Circuit Judges, and SAFFELS, District Judge.[2]
 
 
 2
 Defendants Gary Carter and Timothy Carter appeal their convictions after conditional guilty pleas to possession with intent to distribute less than fifty kilograms of marijuana, in violation of 21 U.S.C. 841(a)(1), (b)(1)(D) and 18 U.S.C. 2. The only issue on appeal is whether the district court erred in denying defendants' motion to suppress evidence obtained after border patrol agents stopped their vehicles.
 
 
 3
 On March 3, 1993, at about 5:00 a.m., defendant Gary Carter drove into the United States Border Patrol checkpoint on northbound Highway 54 in a 1985 Isuzu. He told Border Patrol Agent Manny Cruz that he was going to Alamogordo, New Mexico, and left the checkpoint. Border Patrol Agent Carlos Robles, working backup, was parked off of Highway 54, north of the checkpoint. Robles observed headlights coming toward him and then saw the Isuzu make a U-turn and proceed south on Highway 54. Robles radioed the checkpoint agents and told them that the Isuzu was turning around and no other vehicles were near it.
 
 
 4
 At about 5:04 a.m., Agents Cruz and Gene Corp saw the Isuzu go south past the checkpoint, and Cruz recognized it as the same vehicle he had inspected just a few moments earlier. The agents became suspicious because smugglers sometimes use one vehicle to "scout" the checkpoint before a second vehicle follows with contraband. Robles and Corp followed the Isuzu south to a Fina service station in Orogrande, New Mexico, where the driver parked next to a Ford F-150 pickup equipped with a camper shell. Agent Corp turned on his emergency lights, got out of his vehicle and approached the Isuzu.
 
 
 5
 The driver, Gary Carter, produced a driver's license with a Chaparral, New Mexico, address and said he was going to El Paso. Agent Corp knew that Carter had told Cruz that he was going to Alamogordo. Corp then noticed that the Ford pickup's license plate had the same last three digits as the Isuzu. Corp looked through the window into the camper shell, and saw that the interior ceiling of the camper was disproportionately lower than the exterior height.[3] The pickup truck driver identified himself as Timothy Carter and said that he was going to El Paso. He then produced a driver's license with the same address as Gary Carter. Based on these facts, Corp told Timothy Carter that he was going to walk a trained narcotics dog around the pickup. The dog alerted and the agents removed a small part of the roof of the camper shell where they found bundles wrapped in cellophane; one of the bundles tested positive for marijuana. Both defendants were then arrested.
 
 
 6
 On appeal defendants contend that the border patrol agents did not have reasonable suspicion to stop their vehicles and thus violated their Fourth Amendment rights. Defendants assert that the evidence obtained after the stop should have been suppressed. In reviewing the district court's denial of a motion to suppress evidence, we accept the court's factual findings[4] unless clearly erroneous, viewing the evidence in the light most favorable to the government. United States v. Soto, 988 F.2d 1548, 1551 (10th Cir.1993). "The ultimate determination of reasonableness under the Fourth Amendment, however, as well as other conclusions of law, is reviewed de novo." Id.
 
 
 7
 The parties agree on the standard for determining whether reasonable suspicion exists to stop a vehicle. "[O]fficers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles [are involved in illegal activity.]" United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975). "[T]he 'reasonable suspicion' standard for roving border patrol stops reflects the Court's balancing of 'the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border.' " United States v. Lopez-Martinez, 25 F.3d 1481, 1483 (10th Cir.1994) (quoting Brignoni-Ponce, 422 U.S. at 881).
 
 
 8
 We have summarized the multifactor test that guides our inquiry:
 
 
 9
 in determining whether there is reasonable suspicion to stop a car in the border area, officers may consider any number of factors, including: (1)characteristics of the area in which the vehicle is encountered; (2)the proximity of the area to the border; (3)the usual patterns of traffic on the particular road; (4)the previous experience of the agent with alien traffic; (5)information about recent illegal border crossings in the area; (6)the driver's behavior, including any obvious attempts to evade officers; (7)aspects of the vehicle, such as a station wagon with concealed compartments; and (8)the appearance that the vehicle is heavily loaded.
 
 
 10
 United States v. Monsisvais, 907 F.2d 987, 990 (10th Cir.1990) (citing Brignoni-Ponce, 422 U.S. at 884-85). "Neither Brignoni-Ponce nor its progeny identify a minimum number of factors necessary to constitute reasonable suspicion or any outcome determinative criteria. Indeed, such an approach would be antithetical to a totality of the circumstances inquiry." Lopez-Martinez, 25 F.3d at 1484.
 
 
 11
 The record supports all but one of the district court's findings on factors relevant to the reasonable suspicion determination.[5] The stop occurred near a checkpoint about fifty-five miles from the border. See id. at 1485 (proximity of stop, sixty miles from border, weighs in favor of reasonable suspicion). Highway 54 leads from Juarez, Mexico, through El Paso, Texas, through Orogrande, New Mexico, to a point south of Alamogordo, New Mexico.
 
 
 12
 The government also presented evidence on the technique of using scout cars in alien and narcotics smuggling.[6] See United States v. Pollock, 895 F.2d 686, 690 (10th Cir.) (scout or lead car typically drives through a checkpoint to determine whether it is open and to scout ways around it), cert. denied, 498 U.S. 985 (1990). In Pollock, the driver of a northbound pickup truck came through a border checkpoint, asked for the nearest gas station, and was directed south. The driver turned around but about forty-five minutes later agents spotted the same truck traveling on an old highway followed closely by a large vehicle with out-of-state license plates. The agent testified that those facts fit a typical "scout car" technique used by smugglers. We held that the suspected use of a scout car, together with the fact that the large vehicle appeared heavily loaded and was stopped very early in the morning, provided reasonable suspicion to stop the vehicle. Id. at 690.
 
 
 13
 Defendants argue that Pollock is distinguishable because here the officers stopped both vehicles before noticing any tandem operation, and neither of the vehicles appeared heavily loaded. Defendants assert that "[t]he problem with finding that there was sufficient reasonable suspicion in this case is that it would subject to stop virtually every car which came through the checkpoint heading north and later came through heading south." Brief for Appellants 22; cf. Monsisvais, 907 F.2d at 990 (holding agents may not "stop every heavily loaded pickup truck bearing a camper shell and out-of-state license plates that travels northbound on [Highway 85] at 7:30 p.m.").
 
 
 14
 Defendants' characterization of the factual basis for reasonable suspicion ignores the most relevant details. Gary Carter turned around shortly after going through a northbound checkpoint, out of sight of the checkpoint. He reversed directions after stating he was going north to Alamogordo. After traveling south a short distance he pulled up next to a pickup truck with a camper shell on it. Cf. United States v. Guillen-Cazares, 989 F.2d 380, 383 (10th Cir.1993) (two cars "proceeding closely together and turning south on I-25, does not evoke the same types of suspicions as other situations and maneuvers found in roving border patrol cases").
 
 
 15
 The instant situation is close enough to fit a scout car pattern, which provided reasonable suspicion to stop the vehicle to investigate. Once the stop occurred the agents' observations immediately thereafter clearly justified the continued inquiry that led to discovery of the contraband.
 
 
 16
 AFFIRMED.
 
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [2]
 The Honorable Dale E. Saffels, Senior United States District Judge, United States District Court for the District of Kansas, sitting by designation
 
 
 [3]
 Agent Corp described the camper shell as being "unusually deep," but from our reading of the transcript, it is apparent he was referring to the height of the camper shell compared with the interior ceiling height
 
 
 [4]
 Defendants do not dispute the district court's factual findings, which comport with our recitation of the facts. Although the government brief suggests that the agents knew about the matching license plates and the appearance of the camper shell before stopping the vehicles, at oral argument counsel for the government conceded that the similarity of the license tags and the depth of the camper shell were not noticed before the stop. In any event, the district court did not rely on these asserted facts
 
 
 [5]
 The government presented no testimony concerning the number of aliens apprehended near the checkpoint or recent illegal border crossings. Although the district court stated it considered "the patterns of traffic," the record contained no evidence to support that finding. Although a court might take judicial notice of traffic patterns on a particular road, the judge here made no specific statement about traffic patterns, and we assume he did not intend to take judicial notice of this factor. Cf. United States v. Barbee, 968 F.2d 1026, 1028-30 (10th Cir.1992) (although record "could have been stronger," agents testified as to typical nature of traffic on road). This deficiency does not overcome the other evidence supporting the agents' reasonable articulable suspicion
 
 
 [6]
 The agent testified from his experience on the use of scout vehicles. Although the agent's information--that he had been involved in 100 seizures in ten years, seven of which involved lead cars and one which involved drugs and aliens--was not a strong factor, he also testified on the use of scout cars in smuggling operations