PUBLISH

UNITED STATES COURT OF APPEALS

**Filed 6/21/96**

TENTH CIRCUIT

UNITED STATES OF AMERICA,    )
)
    Plaintiff-Appellant,    )
)
vs.    )    No. 95-2211
)
RAUL GARZA CANTU and    )
IRMA LETICIA MENDOZA-ACOSTA,    )
)
    Defendants-Appellees.    )

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 95-CR-263-JP)

Fred J. Federici, Assistant United States Attorney (John J. Kelly, United States Attorney, with him on the brief), Las Cruces, New Mexico, for Plaintiff-Appellant.

Charles A. Harwood, Silver City, New Mexico (Carmen E. Garza and F. Mario Ortiz, Las Cruces, New Mexico, on the brief), for Defendants-Appellees.

Before ANDERSON, BALDOCK, and HENRY, Circuit Judges.

BALDOCK, Circuit Judge.

Defendants Raul Garza Cantu and Irma Leticia Mendoza-Acosta were indicted on one count of possession with intent to distribute over 100 kilograms of marijuana in violation of 21 U.S.C. § 841(a), and one count of conspiracy to commit the same in violation of 21 U.S.C. § 846. Defendants moved to suppress the evidence resulting from a border patrol agent's stop of their vehicle. The agent stopped the vehicle near a border patrol checkpoint in southern New Mexico on the suspicion that Defendants were operating a "scout" car as part of a marijuana smuggling scheme. The district court granted Defendants' motion, and the government appealed. We exercise jurisdiction under 18 U.S.C. § 3731.

Well established standards govern our review of a district court's ruling on a motion to suppress. Considering the evidence in a light most favorable to the prevailing party, we accept the district court's factual findings unless those findings are clearly erroneous. United States v. Parker, 72 F.3d 1444, 1449 (10th Cir. 1995). The district court's determination of reasonableness under the Fourth Amendment, however, is a question of law reviewable de novo. United States v. Martinez-Cigarroa, 44 F.3d 908, 910 (10th Cir.), cert. denied, 115 S. Ct. 1386 (1995). Applying these standards, we reverse.

I.

On April 11, 1995, at about 3:00 a.m., a red Mercury Grand Marquis entered the permanent border patrol checkpoint located on state highway 70 in Otero County, New Mexico. The checkpoint lies approximately thirteen miles west of Alamogordo, New Mexico, and ninety miles north of the United States/Mexican border. Agent Santiago Silva, a ten-year veteran of the border patrol, asked the driver of the Mercury, Defendant Cantu, and his passenger, Defendant Mendoza-Acosta, whether they were United States citizens. Defendant Cantu responded that they were, but Defendant Mendoza-Acosta responded by producing a resident alien card. Agent Silva then asked the couple where they were traveling. Defendant Cantu responded that they were traveling to Alamogordo, New Mexico, where they lived. Agent Silva then allowed the Mercury to pass the checkpoint. As the Mercury was leaving, Agent Silva noticed the vehicle had a Texas license plate.

The next vehicle to enter the checkpoint was a Chevrolet pick-up truck with a camper shell and Oregon license plates. Victor Ernesto Mendoza (Mendoza) was the driver and sole occupant. The pick-up arrived at the checkpoint around ten minutes after the Mercury, at about 3:10 a.m. While speaking with Mendoza, Agent Silva noticed a discrepancy between the inner ceiling and outer roof of the truck's camper shell. Agent Silva directed Mendoza to the secondary checkpoint for further questioning. Agent Fernando Zepeda, a six-year veteran of the border patrol, joined Agent Silva at the

3

secondary checkpoint. The agents requested permission to search Mendoza's truck.

Mendoza consented. The agents subsequently uncovered approximately 281.9 pounds of

marijuana hidden in the camper shell. During their search, the agents also located a

cellular telephone inside the pick-up.

After discovering the marijuana, Agent Silva told Agent Zepeda about the Mercury

which had cleared the checkpoint ten minutes prior to Mendoza's arrival. The agents

discussed whether the Mercury may have been a "scout" car.[1] Agent Zepeda drove east

toward Alamogordo to determine if the Mercury was still in the area. Four miles east of

the checkpoint, Agent Zepeda saw the Mercury heading back west toward the checkpoint,

away from Alamogordo and the direction Defendants told Agent Silva they were heading.

Agent Zepeda radioed Agent Silva and asked him to identify the Mercury as it passed the

checkpoint headed west. Agent Silva positively identified the Mercury. At

approximately 3:36 a.m., Agent Zepeda stopped the Mercury just west of the checkpoint.

Upon questioning, Defendant Cantu acknowledged that he had cleared the

checkpoint a few moments earlier headed east. Defendant Cantu further informed Agent

Zepeda that he and Defendant Mendoza-Acosta had decided not to go to Alamogordo, but

---

[1] A scout car proceeds through a border checkpoint to determine the likelihood that a subsequent vehicle containing contraband, controlled substances and/or illegal aliens might pass without detection. The scout car determines whether the checkpoint is open, whether agents are inspecting vehicles closely, and whether a dog is present to sniff vehicles. If conditions are favorable, the scout car will then notify the trailing vehicle to proceed. The scout car notifies the trailing vehicle either by returning through the checkpoint or via radio or cellular phone. Vol. II at 18-19.

to return home instead. Agent Zepeda then requested identification. Agent Zepeda immediately recognized that Defendant Mendoza-Acosta and Victor Ernesto Mendoza might be related. The two Defendants voluntarily agreed to return to the checkpoint for further questioning. Defendant Cantu subsequently acknowledged that he owned the pick-up truck in which agents found the marijuana.

At the suppression hearing, both Agents Silva and Zepeda presented uncontradicted testimony consistent with the district court's findings of fact and the foregoing.[2] Based upon those facts, the district court concluded that Agent Zepeda did not have reasonable suspicion to stop Defendants' vehicle. Accordingly, the district court granted Defendants' motion to suppress all physical evidence against them.

II.

Border patrol agents "on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that those vehicles' occupants may be involved in criminal activity. United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975). "[A]ny number of factors" might contribute to an agent's decision to stop a vehicle on reasonable suspicion.

_____

[2] The district court's findings did not indicate at what point the agents located the cellular phone in Mendoza's pick-up truck. Agent Silva testified that the cellular phone was located during the search of the truck. Vol. II at 27-28. The record is silent, however, as to whether Agent Zepeda knew of the cellular phone in the pick-up prior to stopping Defendants.

5

Id. The law does not specify a "minimum number of factors necessary to constitute reasonable suspicion or any outcome determinative criteria." United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir. 1994). Each case turns upon its own facts. United States v. Martin, 15 F.3d 943, 950 (10th Cir.), on reh'g in part, 18 F.3d 1515 (10th Cir.), cert. denied, 115 S. Ct. 187 (1994). In all instances, however, the agent "is entitled to assess the facts in light of his experience" in detecting criminal activity. Brignoni-Ponce, 422 U.S. at 885. Law enforcement officers may perceive meaning in actions that appear innocuous to the untrained observer. Brown v. Texas, 443 U.S. 47, 52 & n.2 (1979). This is not to say that an agent may stop a vehicle on an "unparticularized suspicion or hunch." Terry v. Ohio, 392 U.S. 1, 27 (1968). While the necessary "level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence," the Fourth Amendment requires "'some minimal level of objective justification.'" United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting I.N.S. v. Delgado, 466 U.S. 210, 217 (1984)).

In determining whether a roving border patrol agent had reasonable suspicion to stop a vehicle, we look at the totality of the circumstances, or, in other words, "the whole picture." United States v. Cortez, 449 U.S. 411, 417 (1981). The totality of the circumstances must create a "particularized and objective basis for suspecting the . . . person stopped of criminal activity." Id. at 417-18. The agent's assessment of the circumstances may depend upon objective observations, information obtained from

6

individuals, reports, or other sources, and "consideration of the modes and patterns of operation of certain kinds of lawbreakers." Id. at 418. "The process does not deal with hard certainties, but with probabilities" based upon evidence "as understood by those versed in the field of law enforcement." Id.

On two occasions we have applied the preceding principles of law to determine the constitutionality of a roving border patrol agent's stop of a suspected scout car. In United States v. Martinez-Cigarroa, 44 F.3d 908 (10th Cir.), cert. denied, 115 S. Ct. 1386 (1995), we held that a roving border patrol agent did not have reasonable suspicion to stop defendants' vehicle. In United States v. Carter, No. 94-2081, 42 F.3d 1406, 1994 WL 681005 (10th Cir. Dec. 12, 1994) (unpublished), we held that a roving border patrol agent did have reasonable suspicion to stop defendant's vehicle.

In Martinez-Cigarroa, an agent began following a van he suspected of smuggling illegal aliens. As the agent followed the van along a state highway used to circumvent a border patrol checkpoint on the interstate, the agent passed a Ford Thunderbird with Colorado license plates stopped on the side of the road. The agent noticed that the driver of the Thunderbird showed interest in the van and border patrol car. The agent stopped the van and discovered several illegal aliens therein. He then informed other border patrol agents that he suspected the Thunderbird was a scout car and requested it be stopped. Inside the Thunderbird agents found a small black book containing the names of the illegal aliens in the van. We concluded that a vehicle with Colorado license plates

7

parked along the side of a highway used to circumvent a border patrol checkpoint whose driver showed interest in a patrol car following a van was insufficient to establish a reasonable suspicion of wrongdoing. Martinez-Cigarroa, 44 F.3d at 910-11.

In Carter, a roving border patrol agent witnessed a 1985 Isuzu, reportedly traveling north to Alamogordo, turn around shortly after clearing the checkpoint and head south. After traveling south past the checkpoint, the Isuzu pulled into a service station and next to a truck with a camper shell. At that point, an agent from the checkpoint activated his emergency lights and approached the driver of the Isuzu. Subsequently, a trained narcotics dog alerted on the camper shell. We concluded on these facts that the agent had reasonable suspicion to stop and question the Defendant. Carter, 1994 WL 681005 at *5-7.

### III.

The facts of this case support a stronger suspicion than either Mendoza-Cigarroa or Carter. Based upon information obtained from Agent Silva and his own personal observations, Agent Zepeda at the time he stopped the Mercury knew the following: (1) Border patrol agents had uncovered a large supply of marijuana in Mendoza's pick-up truck around 3:10 a.m.; (2) The Mercury had passed the checkpoint at around 3:00 a.m. directly prior to Mendoza's arrival; (3) Defendant Cantu had told Agent Silva that Defendant Mendoza-Acosta was a United States citizen when she was not; (4) Defendant Cantu told Agent Silva that he and Defendant Mendoza-Acosta were traveling east to

8

Alamogordo where they lived; (5) The Mercury had a Texas license plate; (6) At 3:30 a.m. Agent Zepeda observed the Mercury traveling west back toward the checkpoint in a direction inconsistent with the travel plans Defendants had expressed to Agent Silva; and (7) As the Mercury passed the checkpoint, Agent Silva positively identified it as the vehicle which earlier had preceded Mendoza-Acosta through the checkpoint.

In analyzing the totality of the circumstances, we believe the district court improperly "pigeonhole[d]" each of these facts "as either consistent with innocent travel or manifestly suspicious." United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir. 1994); accord Martin-Cigarroa, 44 F.3d at 912 (Baldock, J., concurring). The Defendants' conduct viewed in isolation may seem innocent enough. But as the Supreme Court has made clear in discussing the totality of the circumstances: "[W]holly lawful conduct might justify the suspicion that criminal activity was afoot." Reid v. Georgia, 448 U.S. 438, 441 (1980). Any one of the facts known to Agent Zepeda considered separately arguably is not proof of any illegal conduct on the part of Defendants, but may be consistent with innocent travel. See Sokolow, 490 U.S. at 9-10; Lopez-Martinez, 25 F.3d at 1484. But we think the facts viewed in the context of the "whole picture" and taken together with Agent Zepeda's training and experience in the "modes and patterns" of scout cars , made Agent Zepeda's suspicion that the Mercury was in fact a scout car for Mendoza quite reasonable.

We hold that the information Agent Zepeda possessed prior to stopping the

9

Mercury was sufficient to establish a reasonable suspicion that the Mercury was involved in criminal activity. Accordingly, the order of the district court granting Defendants' motion to suppress is reversed.

REVERSED and REMANDED.