**UNITED STATES of America, Plaintiff,**

**v.**

**Victor Manuel GALINDO–GONZALES, Defendant.**

**Cr. No. 96–55 JP.**

United States District Court, D. New Mexico.

July 11, 1996.

La Pasada Halfway House, Albuquerque, NM, pro se.

Maria Isabel Vasquez, Liberal, KS, pro se.

Laura M. Scott, U.S. Attorney's Office, District of New Mexico, Albuquerque, NM, for U.S.

## *MEMORANDUM OPINION AND ORDER*

PARKER, District Judge.

The subject of this Memorandum Opinion and Order is "Defendant's Motion to Suppress Evidence Based on Illegal Detention" (doc. # 14), filed March 7, 1996. At a hearing held April 10, 1996, the only witness who testified was New Mexico State Police Officer Norman R. Martinez. Based on the testimony of Officer Martinez, I make findings of fact as set forth below. In addition, after careful consideration of the pleadings, law and facts, I conclude that Mr. Galindo's motion to suppress should be denied.

On January 11, 1996, the New Mexico State Police set up a roadblock on Interstate 25 near Las Vegas, New Mexico for verification of driver's license, vehicle registration and proof of insurance. The State Police placed a stop sign in the northbound lanes, thereby stopping all vehicles traveling north through this stretch of I–25. There were approximately six or seven uniformed officers working the roadblock. The officer assigned to question drivers at the stop sign would ask each motorist for a driver's license, vehicle registration and proof of insurance. The officer then attempted to match the documents with computerized information provided by the State Police radio dispatch to see if the vehicle were stolen or if it

had been used in another crime. If the driver could not produce one of the requested documents, the officer would ask the driver to pull off onto the shoulder of I–25 to avoid detaining traffic. The officer who initially questioned a motorist followed the car to the shoulder to make further inquiries about the missing documentation.

Around 2 to 3 p.m. on January 11, 1996, the defendant, Mr. Galindo, who was driving a full-size Chevrolet Blazer, approached the roadblock stop sign on northbound I–25. Officer Martinez was on duty at the stop sign. Officer Martinez noticed that the Blazer had dark tinted windows and a Kansas license plate, and he initially observed a total of five males in the Blazer. He asked Mr. Galindo for his driver's license and vehicle registration. Mr. Galindo indicated to Officer Martinez that he did not speak much English, and Officer Martinez, who is conversant in Spanish, switched to the Spanish language. Officer Martinez again requested Mr. Galindo's driver's license and vehicle registration. Mr. Galindo produced a Kansas driver's license in the name of Victor Manuel Galindo–Gonzales [1] but told Officer Martinez that he did not have the vehicle registration with him. While Officer Martinez was asking Mr. Galindo for his documents, Officer Martinez noticed that four male passengers—one in the front passenger seat and the other three in the back seat—had dark hair and dark complexions. Officer Martinez also heard the passengers conversing only in Spanish while he was talking to Mr. Galindo.

Officer Martinez talked with Mr. Galindo for about two minutes while on the I–25 roadway before asking him to pull off onto the shoulder of the road. During the initial two minutes, while at the roadblock stop sign, Officer Martinez became suspicious that the passengers in the car were citizens of Mexico and that Mr. Galindo might be transporting undocumented aliens. Officer Martinez explained at the hearing that he

suspected the passengers were Mexican nationals because of their hair and skin color and because they were speaking Spanish. While the purpose of the roadblock was to check for drivers' licenses and proof of registration, Officer Martinez also would routinely observe the driver for signs of intoxication or drug use and would check for the transportation of illegal aliens. During the preceding year, Officer Martinez had seen illegal aliens being transported on four or five occasions—two or three of which occurred at roadblock stops.

Officer Martinez instructed Mr. Galindo to pull off onto the shoulder of the road so that he could call by radio to verify that Mr. Galindo was the registered owner of the vehicle. Officer Martinez admitted that, at the time he directed Mr. Galindo to the shoulder of the road, he already had formed the impression that Mr. Galindo might be transporting illegal aliens.

Officer Martinez followed Mr. Galindo's Chevrolet Blazer to the shoulder. Upon reaching Mr. Galindo's window, he first asked Mr. Galindo who the passengers were. Mr. Galindo did not respond to that inquiry. Officer Martinez then asked Mr. Galindo if any of the passengers had identification. Mr. Galindo answered "no." Officer Martinez then walked from the driver's side to the back of the Blazer to read the license plate. After obtaining the vehicle license plate information, Officer Martinez ran a radio check on Mr. Galindo's driver's license and vehicle license. He discovered that Mr. Galindo's driver's license was valid and that the vehicle was registered in Mr. Galindo's name. In addition, there were no outstanding warrants. Officer Martinez estimated that anywhere from two to ten minutes could have elapsed between the time he asked Mr. Galindo about his passengers and the time he called police dispatch on his radio to check on Mr. Galindo's license.[2]

1. Mr. Galindo is a lawful permanent resident of the United States.

2. During the hearing, Officer Martinez seemed uncertain about his estimate of how much time elapsed between the point at which he began talking to Mr. Galindo on the highway shoulder and the time when he called in the license infor-

mation to the police dispatcher. Based on Officer Martinez's testimony that during this interval he had asked only two questions about Mr. Galindo's passengers and had walked to the back of the car to obtain the license plate information, I find Officer Martinez's lower estimate of two minutes a more reasonable approximation.

Officer Martinez explained that although it was not standard procedure to check passengers' credentials, he decided to ask Mr. Galindo if his passengers had identification documents because he suspected that Mr. Galindo was carrying undocumented aliens and also for purposes of officer safety. After Officer Martinez learned from Mr. Galindo that the passengers had no identification papers, he asked all of the passengers to step out of the vehicle. As they exited, Officer Martinez realized for the first time that there was a total of six male passengers in the Blazer. Two men, who had not been seen by Officer Martinez previously, had been sitting or lying in the rear luggage/storage compartment of the Blazer and exited through the back door of the truck. Officer Martinez asked each passenger for his name, date of birth, and social security number. None of the passengers had identification documents or a social security number. Officer Martinez called in, one by one, the passengers' names and dates of birth on his police radio. The police dispatcher reported that none of the six passengers was listed in the police database. During this time, Officer Martinez observed that the passengers appeared to be timid and that they did not make eye contact with him.

Because these observations further aroused his suspicions, Officer Martinez de-cided to notify the Immigration and Naturalization Services ("INS"). Officer Martinez estimated that approximately 30 to 45 minutes [3] elapsed between the time Mr. Galindo pulled his vehicle onto the shoulder and the time Officer Martinez called INS. Dispatch informed Officer Martinez that an INS agent from Albuquerque would meet the officer and the suspects at the New Mexico State Police Office in Las Vegas, New Mexico. The drive from the roadblock to the State Police Office was about eight miles. The drive from INS in Albuquerque to Las Vegas was about a two hour trip.

## LEGAL ANALYSIS:

At the April 10, 1996 hearing, the parties agreed that this roadblock stop was more like a roving traffic stop than a border checkpoint stop. Because a traffic stop is analogous to an investigative detention, I must analyze what occurred during this roadblock stop under the principles pertaining to investigative detentions as set out in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "To determine the reasonableness of an investigative detention, we make a dual inquiry, asking first 'whether the officer's action was justified at its inception,' and second, 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.' " [4] *Unit-*

---

3. This estimate of 30 to 45 minutes includes the two minutes that Officer Martinez spent with Mr. Galindo on the shoulder before he contacted dispatch on his radio. After all of the passengers had exited the vehicle, Officer Martinez asked each man for his name, date of birth, and identification documents. He then called in each passenger's name and date of birth and waited for a response from the dispatcher. It was not clear from the testimony whether Officer Martinez called in a single name and then awaited a response before calling in another name or whether he provided all of the names, one after another, to dispatch before receiving a response. There was no testimony regarding the amount of time that elapsed before the dispatcher responded. I find that Officer Martinez's lower estimate of 30 minutes was more reasonable based on his recall of what occurred during this time interval.

4. There is Tenth Circuit authority supporting the argument that the second inquiry under *Terry* is primarily concerned with the length of the lawful duration of the original stop. *United States v. Wood*, 915 F.Supp. 1126, 1140 n. 4 (D.Kan.1996) (citing *United States v. Rivera*, 867 F.2d 1261,

1263 (10th Cir.1989)). In other words, if the concurrent or subsequent questioning does not unreasonably prolong the duration of the initial stop, there is no Fourth Amendment violation. *Id.*

In his original brief, Mr. Galindo primarily asserted that State Police were conducting a sobriety checkpoint and that Mr. Galindo should have been allowed to proceed once police observed that Mr. Galindo exhibited no signs that he was intoxicated. In that brief, Mr. Galindo contended that instead of permitting him to proceed, the police unlawfully detained him for approximately two hours at the shoulder of the highway and for approximately one hour while he awaited the arrival of INS agents from Albuquerque.

At the April 10, 1996 hearing, Officer Martinez clarified that the roadblock was established to check for drivers' licenses, registration and insurance. Mr. Galindo conceded in his letter of April 12, 1996 that the purpose of the roadblock was to check for drivers' licenses and proof of registration rather than for the sobriety of the driver. Hence, Mr. Galindo apparently aban-

ed States v. Botero–Ospina, 71 F.3d 783, 786 (10th Cir.1995) (quoting Terry, 392 U.S. at 20, 88 S.Ct. 1868), cert. denied, 518 U.S. 1007, 116 S.Ct. 2529, 135 L.Ed.2d 1052 (1996). If a subsequent line of inquiry is unrelated to the initial traffic stop, the officer must have a reasonable, articulable suspicion that unlawful activity has occurred or is occurring. United States v. Alvarez, 68 F.3d 1242, 1244 (10th Cir.1995), cert. denied, 517 U.S. 1143, 116 S.Ct. 1436, 134 L.Ed.2d 557 (1996). See also United States v. Jones, 44 F.3d 860, 871 (10th Cir.1995) ("To determine the validity of a roadside detention, we balance the intrusion on Fourth Amendment rights against the importance of the government interests involved. An ordinary traffic stop is a limited seizure and is more like an investigative Terry stop than a custodial arrest. We therefore assess the reasonableness of traffic stops under the principles set forth in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).") (citations omitted).

▮▮▮ Because Mr. Galindo does not challenge the initial I–25 roadblock stop, which he characterizes in his letter dated April 12, 1996 as "a routine road block to check license and registration," the critical inquiry is whether Officer Martinez's concurrent detention of Mr. Galindo for questioning about his passengers constituted a seizure in violation of the Fourth Amendment.[5] I must evaluate Officer Martinez's questioning of Mr. Galindo about his passengers under the second prong

of Terry by analyzing whether Officer Martinez's inquiries were "reasonably related in scope to the circumstances which justified the interference in the first place," Terry, 392 U.S. at 19–20, 88 S.Ct. 1868, or whether there was reasonable suspicion of unlawful activity to justify Officer Martinez's questions about Mr. Galindo's passengers.

> Subsequent or concurrent detentions for questioning are justified only when the officer has 'reasonable suspicion of illegal transactions in drugs or of any other serious crime.' 'Whether such an investigative detention is supported by an objectively reasonable suspicion of illegal activity does not depend upon any one factor but on the totality of the circumstances.'

Jones, 44 F.3d at 872 (citations omitted). The totality of the circumstances includes the agent's objective assessment of the circumstances, information obtained from other sources or individuals, and "consideration of the modes and patterns of operation of certain kinds of lawbreakers." United States v. Cantu, 87 F.3d 1118, 1121 (10th Cir.1996) (citation omitted). " 'The process does not deal with hard certainties, but with probabilities' based upon evidence 'as understood by those versed in the field of law enforcement.' " Id. (citations omitted).

In Jones, the Tenth Circuit held that, under the totality of the circumstances, the further roadside detention for questioning Ms. Jones was supported by an objectively reasonable suspicion of illegal activity.[6] Id.

doned his earlier argument that he should not have been directed to the shoulder of I–25 after he was unable to produce proof of the vehicle's registration. It is my understanding that Mr. Galindo, after being satisfied that the roadblock was for purposes other than a sobriety check, no longer claims a Fourth Amendment violation based solely on the length of the roadside detention, but instead contends that he was unlawfully seized because the officer's questions exceeded the proper scope of inquiry.

Furthermore, in the April 12, 1996 letter, Mr. Galindo did not argue that Officer Martinez detained him for an unreasonable length of time after Officer Martinez had discovered that none of the passengers had identification documents. If Mr. Galindo's brief and letter can be interpreted to raise this argument, I conclude that once Officer Martinez realized Mr. Galindo's five adult male passengers had no identification documents, the ensuing length of detention was rea-

sonable. I also note that Mr. Galindo did not present any evidence at the hearing regarding how long he was detained during the stop.

5. The government first contended that Mr. Galindo's motion to suppress should be denied because Mr. Galindo did not have standing to challenge the stop or subsequent detention of his passengers. I reject this argument because Mr. Galindo asserts his Fourth Amendment claim on the basis that his personal continued detention was unlawful. As a result of his alleged illegal detention, Mr. Galindo seeks to suppress certain incriminating statements made by the passengers that he contends are fruits of the illegal detention.

6. Ms. Jones did not contest the initial stop for speeding; she challenged only the concurrent questions by the officer about the transportation of drugs.

The officer in *Jones* saw Ms. Jones' vehicle speeding on a Wyoming highway.. The officer signaled the driver, Ms. Jones, to stop, but she did not pull over immediately. After Ms. Jones finally stopped her car, the officer verified that it was not stolen and noted that it had California plates and was rented from Budget Rent–A–Car. The officer observed that there were two occupants and that there were three small pieces of luggage on the back seat. The officer asked Ms. Jones for her driver's license and rental car agreement. He also asked about the occupants'. travel plans. Ms. Jones responded that they were driving from Los Angeles to Detroit. The officer also learned that Ms. Jones and her passenger were returning to Detroit from a two week vacation in Los Angeles. The officer noticed that the Budget contract showed a Mr. Scott as the renter. The officer then returned to his vehicle to run a computer check on Ms. Jones' documents. The police dispatcher's response initially was ambiguous and the officer told Ms. Jones that she would have to wait until he received further information. Concurrent with this investigative detention, the officer questioned Ms. Jones about the transportation of contraband.

.The officer had identified several factors that heightened his suspicion that Ms. Jones might be carrying drugs. These included the large size of the car, Ms. Jones' travel itinerary involving two cities that are known for high drug usage, the lack of luggage for a two week trip, Ms. Jones' failure to stop the car immediately in response to the officer's signal, and her .inability to prove authorization to operate the rental car. *Id.* at 872. Thus, the court concluded that the officer's concurrent questions about the possible transportation of drugs were supported by an objectively reasonable suspicion that Ms. Jones was transporting contraband. *Id.*

In *United States v. Alvarez,* 68 F.3d 1242, 1244 (10th Cir.1995), the Tenth Circuit again analyzed whether an officer's later questions were "reasonably related in scope to the circumstances which justified the interference in the first place" and held that an officer's second inquiry about the cargo in a vehicle was legitimate. In reversing the district court's suppression order, the Tenth Circuit noted that "[c]ourts are to view the officer's conduct through a filter of 'common sense and ordinary human .experience'" and that courts should "avoid unrealistic second-guessing of police officers' decisions." *Id.* (citations omitted). Courts are to "accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *Id.* (citation omitted). In further support of the deference courts are to pay to the decisions of a law enforcement officer, the United States Supreme Court recently stated in dictum that while a layman, untrained in law enforcement, might not find certain factors suggestive of criminal activity, the same factors might constitute reasonable suspicion on the part of a trained officer based on the officer's experience. *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996).

In *United States v. Salinas–Calderon,* 728 F.2d 1298 (10th Cir.1984), a case factually similar to this case, the Tenth Circuit also reversed the district court's suppression order. The *Salinas* court held that the officer had probable cause to make a warrantless arrest of a driver who was transporting six males in the back of his truck. The officer had pulled Mr. Salinas over when the officer saw the truck weaving erratically on the highway. The officer asked Mr. Salinas for his driver's license. Mr. Salinas did not respond and upon asking him the same question again, the officer realized that Mr. Salinas did not speak English. Mr. Salinas' front-seat passenger identified herself in English as Mr. Salinas' wife. She informed the officer that Mr. Salinas did not speak English. She said that she had a driver's license and that she had been driving most of the time. She explained that Mr. Salinas, who did not have a driver's license, had taken over driving temporarily because their baby was fussing. In responding to the officer's questions, Mrs. Salinas said that her husband was from Mexico and that they were going from Manzanola, Colorado to Florida. Mrs. Salinas also responded that her husband did not have a green card.

At this point, the officer asked Mrs. Salinas the identity of the people in the back of the pickup. She said that they were friends who had been working with them on a farm in Colorado and that they had asked for a ride to Florida. The officer directed Mrs. Salinas to walk to the back of the truck with him. He asked the male occupants to exit the vehicle and discovered that none of them spoke English or had identification documents. The officer admitted that he did not know exactly what offense, if any, he had observed at this time, but he decided to call the Immigration Service. The district court held that the officer did not have probable cause to arrest Mr. Salinas and the six passengers primarily because of the officer's uncertainty about whether the driver was engaged in illegal activity.

The Tenth Circuit concluded that despite the officer's subjective uncertainty, the inquiry should focus on what objective facts supported the officer's actions. *Id.* at 1301. Mr. Salinas argued on appeal that the state trooper did not have the authority to detain the passengers while he inquired into immigration matters.[7] The court stated that "[a] state trooper has general investigatory authority to inquire into possible immigration violations. Moreover, the trooper's question about the green card was reasonable under the circumstances, and thus lawful." 728 F.2d at 1301 n. 3 (*citing Terry,* 392 U.S. at 19, 88 S.Ct. 1868). Although the court was addressing a *Miranda* issue, the court characterized the officer's inquiry about the passengers as being "limited to their identification and place of origin. The routineness of this inquiry demonstrates that the officer was still in a stage of investigation." *Id.* at 1302.

In *United States v. Wood,* 915 F.Supp. 1126 (D.Kan.1996), the defendant complained that the state trooper's questions about his rental car, travel itinerary and plans, and his occupation were asked without reasonable suspicion. The trooper asked these questions while he awaited a report on the vehicle identification from dispatch. The court stated:

Though it has been said that 'concurrent detentions for questioning are justified only when the officer has reasonable suspicion,' and that questions unrelated to the traffic stop took the detention to 'a new phase,' the Tenth Circuit in these situations was dealing with objectionable questions related to the transportation or possession of firearms, contraband or drugs. In contrast, the Tenth Circuit has approved of routine inquiries into a driver's destination, occupation, and *relationship with a passenger,* in the absence of reasonable suspicion. *See e.g., United States v. Rivera,* 867 F.2d 1261, 1262–63 (10th Cir. 1989) (officer 'could legitimately ask questions relating to the identity and travel plans of' the defendants, including their relationship).

915 F.Supp. at 1139–40 (some internal citations omitted) (emphasis added).

The district court in *Wood* noted that an officer's questioning of a suspect, even if unrelated to the stop, does not by itself amount to a Fourth Amendment violation. *Id.* at 1140 n. 4. "Questioning is not a seizure." *Id.* (*citing Florida v. Bostick,* 501 U.S. 429, 433, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). The district court concluded that the trooper's questions about the rental car, driver's itinerary and driver's occupation "were brief and more akin to casual conversation than any interrogation." *Id.* at 1140. "Such questions were permissible conversation during a routine stop and did not take the investigative detention into a new phase." *Id.*

■ Similarly in this case, Officer Martinez simply asked Mr. Galindo who his passengers were before running a computer check on Mr. Galindo's driver's license and vehicle information. This question about Mr. Galindo's passengers did not appear to prolong the detention for more than a moment. In other words, this is not a case in which Officer Martinez continued to ask Mr. Galindo investigative or accusatory questions after he already had discovered that Mr. Galindo had a valid license and proof that he was entitled to operate the car. When Officer Martinez inquired about Mr. Galindo's pas-

---

7. Mr. Salinas did not contest the initial stop of the truck.

sengers, Officer Martinez did not know yet that the vehicle was registered to Mr. Galindo. *Compare United States v. McSwain,* 29 F.3d 558, 561 (10th Cir.1994) (concluding that the officer's reasonable suspicion about a possible traffic violation was dispelled prior to the time the officer asked questions of the defendant and requested his identification, but also recognizing that there is Tenth Circuit support for the proposition that an officer conducting a routine traffic stop may make routine inquiries as long as the officer, at the time he or she asks the additional questions, still has some "objectively reasonable articulable suspicion" that a traffic violation has occurred).

Officer Martinez's initial inquiry about the passengers was more akin to brief and casual conversation that is permissible after an officer makes a legitimate stop of a vehicle than to an interrogation that prolonged the detention. The Tenth Circuit has characterized general inquiries about a driver's relationship to passengers as legitimate, routine questions that officers may ask in the absence of reasonable suspicion. *See Rivera,* 867 F.2d 1262–63; *Salinas,* 728 F.2d at 1302. Furthermore, the Tenth Circuit has explained that questions pertaining to immigration matters, in particular, are within an officer's general investigatory authority. *Salinas,* 728 F.2d at 1301 n. 3. In addition, Officer Martinez testified that officer safety was part of his reason for asking about Mr. Galindo's passengers. When Officer Martinez asked the first question about who the passengers were, the detention did not enter a new phase. Based on Tenth Circuit precedent, Officer Martinez did not need reasonable

suspicion to make general inquiries into the relationship of the passengers to the driver.

After Mr. Galindo did not respond to Officer's Martinez's question about who the passengers were, Officer Martinez followed up by asking if the passengers had any identification. Officer Martinez's second question regarding the passengers' identification was merely an extension of the first routine inquiry and does not require a finding of reasonable suspicion. The officer's second question and Mr. Galindo's response were very brief and did not significantly prolong the detention.

■ However, even if Officer Martinez did need reasonable suspicion to ask if the passengers possessed identification, it appears that under a totality of the circumstances there was reasonable suspicion to make this further inquiry. The following factors, considered together, support a finding of reasonable suspicion of illegal activity. The roadblock where Officer Martinez encountered Mr. Galindo was on Interstate 25, the only North–South Interstate Highway in New Mexico. I–25 provides the most direct continuous northerly route from the southern part of the state near the Mexican border across New Mexico to Colorado and more northerly states.[8] Officer Martinez observed that the truck Mr. Galindo was driving had dark tinted windows and that it was a full-sized Blazer.[9] During the initial stop, Officer Martinez had observed that Mr. Galindo was transporting at least four adult male passengers. He saw that each of the occupants' skin and hair color was dark.[10] After talking

---

**8.** I–25 originates in Las Cruces, New Mexico which is about 55–60 miles from Ciudad Juarez, Mexico. To reach I–25 in Las Cruces, travelers from Juarez would take Interstate 10 from El Paso, Texas, which is just across the border from Juarez.

**9.** I take judicial notice that a full-sized Blazer, in contrast to a S–10 off-road Blazer, is a spacious truck with plenty of room to carry numerous passengers.

**10.** Although the United States Supreme Court, in *United States v. Brignoni–Ponce,* 422 U.S. 873, 886–87, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), stated that the physical characteristics identified with Mexican ancestry are not sufficient alone to support a finding of reasonable suspicion that

the person is an illegal alien, the Court also said "[t]he likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor...." I have, therefore, considered Officer Martinez's observations that the passengers in Mr. Galindo's car had dark hair and dark complexions as part of the totality of circumstances that would support a finding of reasonable suspicion. However, I am very concerned about the weight to be assigned to this factor because many United States citizens have dark hair and skin and speak primarily Spanish. I expressed this concern to Officer Martinez when I asked him during the hearing if he did not encounter regularly United States citizens who fit his description of the physical characteristics he ascribed to citizens of

to Mr. Galindo, Officer Martinez quickly realized that Mr. Galindo did not speak English. In addition, Officer Martinez heard the passengers speaking Spanish exclusively. Officer Martinez noticed in particular that Mr. Galindo did not respond to his first question about the passengers. In addition, in the past year, Officer Martinez had observed aliens being transported on four or five occasions, two or three of which occurred at roadblock stops. "The Fourth Amendment does not require police officers to close their eyes to suspicious circumstances." *United States v. Rascon–Ortiz*, 994 F.2d 749, 753 (10th Cir.1993) (citation omitted). If considered alone, any one of the above mentioned factors might not amount to reasonable suspicion of unlawful activity. However, the Tenth Circuit has warned that district courts should not improperly "pigeonhole" each factor "as either consistent with innocent travel or manifestly suspicious." *Cantu*, 87 F.3d at 1122 (citation omitted). "The Defendants' conduct viewed in isolation may seem innocent enough. But as the Supreme Court has made clear in discussing the totality of the circumstances: '[W]holly lawful conduct might justify the suspicion that criminal activity was afoot.'" *Id.* (citations omitted).

Hence, I conclude that Officer Martinez's initial query regarding Mr. Galindo's passengers was a legitimate, routine question and that reasonable suspicion was not required to ask a question about the relationship of the passengers to the driver. In addition, Officer Martinez's second inquiry about the passengers' identification documents was an extension of this first question and also within the purview of Officer Martinez's general authority to ask routine questions. Furthermore, even if reasonable suspicion were required before Officer Martinez could ask about the passengers' identification, under a totality of the circumstances, taken together with Officer Martinez's recent experience in detecting the transportation of illegal aliens at roadblocks, Officer Martinez's follow-up question was supported by an objectively reasonable and articulable suspicion that Mr.

Mexico. Furthermore, Officer Martinez has dark hair and speaks Spanish as well as English. Consequently, I have difficulty attributing more

Galindo was involved in the transportation of undocumented aliens.

IT IS THEREFORE ORDERED that defendant Galindo's motion to suppress (doc. # 14) is DENIED.

than minimal significance to the factor of physical appearance.